**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | Chapter 11 |
| MOSAIC COMPANIES, LLC, *et al.*, | Case No. 25-11296 (CTG) |
| Debtors.[1] | Joint Administration Requested |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL DEBTOR WALKER & ZANGER, LLC'S ASSETS AND
CERTAIN ASSETS OF DEBTOR SURFACES SOUTHEAST, LLC, TO WZ BUYER,
LLC, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER
INTERESTS; (II) APPROVING THE DEBTORS' ENTRY INTO THE ASSET
PURCHASE AGREEMENT WITH WZ BUYER, LLC, AND CERTAIN ANCILLARY
AGREEMENTS; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO
WZ BUYER, LLC; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"

or "Mosaic") respectfully move (this "Motion") as follows:

**RELIEF REQUESTED**

1.     The Debtors seek entry of an order, substantially in the form attached hereto

as **Exhibit A** (the "Proposed Order"):

(i)     authorizing and approving the Debtors' entry into and performance

under that certain Asset Purchase Agreement, attached hereto as **Exhibit B** (the "APA"),[2] by and

between Mosaic Companies, LLC (the "Parent"), Walker & Zanger, LLC ("Walker Zanger"), and

Surfaces Southeast, LLC ("Surfaces," and with Walker Zanger, the "Sellers"), WZ Buyer, LLC

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Mosaic Companies, LLC (0759); Surfaces Southeast HoldCo, LLC (8822); Mosaic Midco, LLC (0759); Retile, LLC (7285); Wallec Enterprises, LLC (4482); CAYP, LLC (6869); Surfaces Southeast, LLC (9283); Walker & Zanger, LLC (6215); WZCA Holdings, LLC (9859); Mustang Stone Quarries, LLC (9922).  The Debtors' mailing address is 400 Technology Ct. Ste R, Smyrna, GA 30082.

[2]     Capitalized terms used but not defined herein are used as defined in the APA.

(the "Buyer"), and Artivo Surfaces, LLC (the "Guarantor" and, collectively with the Parent, the Buyer, and the Sellers, the "Parties");

   (ii) authorizing and approving the sale (the "Sale Transaction") of the Purchased Assets (as defined herein and in the APA), substantially on the terms contained in the APA;

   (iii) authorizing the Debtors to sell the Purchased Assets to the Buyer free and clear of any and all mortgages, liens (statutory or otherwise, including as defined in the APA and section 101(37) of the Bankruptcy Code), claims (as defined in section 101(5) of the Bankruptcy Code), licenses, sublicenses, pledges, security interests, charges, hypothecations, restrictions (including restrictions on transfer or use), claims of ownership, leases, subleases, options, rights of use or possession, preferences, encroachments, restrictive covenants, rights of first offer or refusal, title or survey defects, or other encumbrances or similar restrictions of any kind, including successor liability, except those Permitted Liens and Assumed Liabilities expressly identified in the APA (collectively, the "Encumbrances") pursuant to section 363(f) of the Bankruptcy Code and the terms set forth in the APA;

   (iv) authorizing the assumption and assignment of the Transferred Contracts (as defined in the APA); and

   (v) granting related relief.

   2. In support of this Motion, the Debtors submit the *Declaration of Randall Jackson in Debtors' Motion for Entry of an Order (I) Authorizing the Sale of Substantially All Debtor Walker & Zanger, LLC's Assets and Certain Assets of Debtor Surfaces Southeast, LLC, To WZ Buyer, LLC, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Debtors' Entry Into the Asset Purchase Agreement with WZ Buyer, LLC, and*

*Certain Ancillary Agreements; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases To WZ Buyer, LLC; and (IV) Granting Related Relief* (the "<u>Sale Declaration</u>") filed substantially contemporaneously herewith and incorporated herein by reference.

## <u>PRELIMINARY STATEMENT</u>

3.      This is a Motion to approve a private Sale Transaction of the Debtors' Walker Zanger and Anthology businesses as a going concern to a well-capitalized industry Buyer, an affiliate of Artivo Surfaces.  The Sale Transaction represents the culmination of more than three years of formal and informal marketing efforts to sell the Debtors' businesses in the aggregate or individually.  If approved, the Sale Transaction will allow Walker Zanger, a leading stone and tile design resource in North America, and the Debtors' Anthology business, to continue as a going concern.  The value-maximizing Sale Transaction will also preserve at least 140 jobs and dozens of trade and customer relationships that would otherwise be lost.

4.      Time is of the essence in approving the Sale Transaction.  The Debtors have limited resources and cannot afford a prolonged approval and closing process.  If approved, the APA will provide much-needed gross proceeds of up to $17.5 million to the Debtors' estates for the benefit of the Debtors' estates and their stakeholders.  Closing the Sale Transaction will substantially reduce the Debtors' operating cash burn, including as related to real property leases, employees, and vendors.  The Debtors also believe that these proceeds will be sufficient to pay off their DIP Facility and Prepetition ABL Facility (each as defined in the Interim DIP Order), thereby immediately realizing interest-expense and other savings.  Absent expeditious approval and closing of the Sale Transaction by no later than August 22, 2025, the Debtors are at risk of being

unable to sustain operations, which would cause irreparable harm to their businesses and the value of their estates.

5.       For these and the other reasons discussed herein and in the Sale Declaration and the First Day Declaration, the relief requested in this Motion should be approved.

## JURISDICTION

6.       The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue of the chapter 11 cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7.       The Debtors consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.       The statutory bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

9.       On July 8, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to manage

their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed in these cases.

10. The Debtors are a nationally recognized leader in the surfaces industry offering a broad range of products including luxury wall and mosaic tile, floor tile, and slab to their retail and wholesale customers. Headquartered in Smyrna, Georgia and Hialeah, Florida, the Debtors maintain a national footprint through their 11 showrooms, 11 slab galleries, and two warehouses and distribution centers across the United States.

11. Additional detail regarding the Debtors, their business, the events leading to the commencement of these cases, and the facts and circumstances supporting the relief requested herein is set forth in the *Declaration of Randall Jackson in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") [D.I. 4], which is incorporated herein by reference.

**I.    The Debtors' Prepetition Marketing and Sale Process**

12. The Debtors believe that a private sale of the Purchased Assets to the Buyer pursuant to the terms and conditions of the APA is both appropriate and in the best interests of the Debtors, their estates, and their creditors. The APA represents the highest or otherwise best offer for the Purchased Assets under the circumstances and will provide a greater recovery for their estates than any known or achievable alternative.

13. The Debtors' assets, including the Purchased Assets subject of this Moton, have been extensively marketed for more than three years. In April 2022, the Debtors engaged Harris Williams LLC ("Harris Williams") to market the Debtors' businesses—Walker Zanger, Opustone and Surfaces—as a combined enterprise. In the second quarter of 2022, Harris Williams began pre-marketing the Debtors' business on a no-names basis with a comprehensive list of over

one hundred financial, sponsor-backed strategic, and strategic buyers.  By July 2022, Harris Williams's efforts resulted in a comprehensive list of potential buyers that Harris Williams could engage upon a formal launch of the marketing.

14.    In late 2022, Harris Williams conducted introductory meetings between the Debtors' then-CEO and a group of eight financial sponsors that registered interest in learning more on a preliminary basis.  Harris Williams also continued to gauge interest with the broader buyer universe as well as credit market check with lenders familiar with the Debtors' sector and business model.  However, in view of the lack of market engagement and a choppy U.S. housing market, Harris Williams recommended that the Debtors focus on internal initiatives until marketing dynamics improved, including continued integration of showroom acquisitions, improving Walker Zanger's business, stabilizing the Debtors' management team, and commencing discussions to refinance the Debtors' secured debt obligations.

15.    In February 2023, at the request of the management team and other key stakeholders, Harris Williams recommended a targeted group of buyers to approach for informed feedback on valuation and outlined a process to maximize optionality, while creating a path for interested groups to pursue an acquisition of the Debtors' businesses as a whole.

16.    In April and May 2023, Harris Williams engaged thirteen (13) potential bidders and reviewed an extensive set of marketing materials.  Five (5) parties submitted initial indications of interest.  Throughout May and June 2023, Harris Williams supported comprehensive diligence for all the potentially interested bidders, including facilitating a management presentation and site visits, updating and maintaining access to a data room, and conducting significant follow-up with the management team.  While conducting next stage diligence with these groups, Harris Williams also engaged other inbound interest from strategic buyers that

ultimately fell away.  All five parties that submitted IOIs except for one ultimately withdrew their interest.  The Debtors, in consultation with their advisors, determined the last remaining bid was not actionable on the terms presented.

17.     Despite a lack of interest from potential buyers, the Debtors continued to pursue strategic options throughout the remainder of 2023 and 2024, incorporating feedback from prior marketing initiatives along the way.  In August 2024, the Debtors re-engaged Harris Williams to help navigate inbound strategic interest from two groups regarding the Debtors' showroom-focused business (including, specifically, Walker Zanger).  To stoke competition, Harris Williams shared informational diligence packages with four strategic buyers.  Harris Williams also helped prepare an overview on the distribution-focused business, which the Debtors used to leverage discussions with potential buyers.  Through these efforts, three (3) parties submitted initial indications of interest.  Of the three interested bidders, two were for the combined showroom businesses (*i.e.*, Walker Zanger and Opustone) and one—from an affiliate of The Home Depot—was for Opustone only.  Given the higher value and certainty of the bid submitted for Opustone by The Home Depot, among other reasons, the Debtors pursued and ultimately closed a transaction with The Home Depot for the Opustone business in April 2025.  Indeed, the purchase price for the Opustone transaction was higher than any other bid the Debtors had received for the entire enterprise as a whole, and close to double what the Debtors had paid for the business less than four years before.

18.     In spring 2025, the Buyer emerged as the sole interested party who could submit a viable bid for a going-concern sale of the Walker Zanger business, and the Debtors continued negotiations with the Buyer.  These negotiations resulted in the parties entering into a

letter of intent on May 27, 2025.  Following confirmatory diligence by the Buyer and extensive arm's-length negotiations between the parties, the parties executed the APA on July 3, 2025.

19.     The proposed Sale Transaction, if approved, will provide the Debtors with approximately $17.5 million in proceeds which is anticipated to be sufficient to fully satisfy the Debtors' obligations under the DIP Facility and Prepetition ABL Facility, and generate excess proceeds for administering the Debtors' estates and ultimate distribution to creditors.  Given the extensive prepetition marketing process, the Debtors do not believe that a postpetition auction and sale process is likely to yield a higher or otherwise better going concern bid for the Walker Zanger and Anthology businesses.  Moreover, the Debtors do not project sufficient available liquidity and cash collateral to fund these businesses as a going concern beyond August 22, 2025.  Accordingly, the Debtors believe that proceeding to approval and closing of the Sale Transaction on a private sale basis before August 22, 2025, is both warranted and necessary under the circumstances.

20.     Importantly, the Debtors, in consultation with their advisors, believe that the cost and delay of running an auction process for the Purchased Assets would outweigh any potential marginal increase to the Purchase Price (if an increase could be achieved at all), particularly in light of the benefits to the Debtors, their estates, and all stakeholders if the Sale Transaction is approved expeditiously.  The Debtors and their advisors believe that proceeding to closing is in the best interests of the Debtors and all parties in interest.  Ultimately, approval of the Sale Transaction will provide the most efficient path to divesting the Purchased Assets for fair consideration and preserve value to distribute to creditors and pursue a liquidating chapter 11 plan.

## II.    Summary of Key APA Terms

21.    The following is a summary of the material terms of the APA, including matters required to be disclosed pursuant to Local Rule 6004-1(b)[3]:

| Provision | Summary Description |
|---|---|
| **Parties**<br><br>(APA Preamble) | <u>Sellers</u>:  Walker & Zanger, LLC ("**W&Z**") and Surfaces Southeast, LLC ("**Surfaces**" and, together with W&Z, each a "**Seller**," and collectively, the "**Sellers**")<br><br><u>Parent</u>: Mosaic Companies, LLC ("**Parent**")<br><br><u>Buyer</u>: WZ Buyer, LLC ("**Buyer**")<br><br><u>Guarantor</u>: Artivo Surfaces, LLC ("**Guarantor**") |
| **Sale to Insider** | Neither Buyer nor Guarantor are insiders of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. |
| **Agreements with Management**<br><br>(APA § 5.10(a)) | The Buyer has not discussed or entered into any agreements with management regarding compensation or future employment.<br><br>Buyer shall make (or cause one of its Affiliates to make) offers of employment to at least 140 of those Business Employees listed on <u>Section 5.10(a)</u> of Sellers Disclosure Letter (the "**Offer Employees**"), on terms and conditions as determined by Buyer that are (x) substantially comparable in the aggregate to those currently provided by the Sellers (including at least the same level of base compensation) or (y) consistent with those of similarly situated employees of Buyer, effective as of the Closing Date, subject to Buyer's right to require successful completion of customary employee background checks, drug testing, and other personnel screening requirements in place for Buyer's similarly situated employees prior to offering employment to any such Offer Employee; provided, however, Buyer agrees that Buyer shall not consider compensation information in the selection of Business Employees to the extent prohibited under applicable salary history ban Laws (such Offer Employees who are hired by and commence active employment with Buyer or an Affiliate, the "**Transferred Employees**").<br><br>Buyer and its Affiliates will have no obligations or other Liabilities under this Agreement with respect to any Business Employee who does not receive an offer of employment from Buyer or any Offer Employee who does not become a Transferred Employee in accordance with this <u>Section 5.10</u> (any such employee, a "**Non-Transferred Employee**") and Sellers shall be exclusively responsible for all Liabilities arising from the employment of any such Non-Transferred Employee or their termination of such employment (including any severance and other similar costs).  Buyer agrees that Buyer does not intend, with respect to the Purchased Assets or Transferred Employees, to engage in a "plant closing" or "mass layoff," as such terms are defined in the applicable WARN regulation, within sixty (60) days after the Closing Date.  Buyer shall be exclusively responsible for all Liabilities arising from the employment of Transferred |

---

[3]    This summary is provided for the convenience of the Court and parties in interest and describes, generally, the terms contained in the APA.  To the extent there is any conflict between this summary and the APA, the APA shall govern in all respects.

| | |
|---|---|
| | Employees after their commencement of employment with Buyer or its Affiliates pursuant to this Agreement. |
| **Purchase Price**<br><br>(APA § 1.1) | The Base Purchase Price is $17,500,000.<br><br>Purchase Price means (a) the Base Purchase Price, minus (b) the Net Working Capital Shortfall, if any, plus (c) any Prorated Credits, if any, minus (d) the Adjustment Escrow Amount. |
| **Purchased Assets**<br><br>(APA § 2.1) | All of Sellers' and their Affiliates' respective right, title, and interest in and to all of the following property, assets, rights, and privileges of Sellers and their Affiliates that are used in, or otherwise held for use in, the Business,[4] subject to the limitations set forth in this Agreement, in each case, as they exist at the Closing:<br><br>Purchased Assets include:<br><br>(a) *Contracts.* Subject to Section 2.8, all rights, title and interest of Sellers to those Contracts listed on Section 2.1(a) of Sellers Disclosure Letter; provided that the purchase orders listed therein (i) shall be updated by Sellers one (1) Business Day prior to the Closing and (ii) shall exclude or be deemed to exclude all purchase orders in respect of the Excluded Quartz Business (the "**Transferred Contracts**"), which schedule may be modified by Buyer from time to time after the date hereof in accordance with and subject to Section 2.8;<br><br>(b) *Acquired Leased Real Property.* Subject to Section 2.8, the Leased Real Property listed on Section 2.1(b) of Sellers Disclosure Letter (the "**Acquired Leased Real Property**"), including all plants, buildings, structures, fixtures and improvements of all kinds situated thereon, and all privileges, rights, easements, hereditaments and appurtenances belonging to or for the benefit of such Leased Real Property;<br><br>(c) *Business Inventory.* All Business Inventory, including all prepaid inventory (shipped and unshipped);<br><br>(d) *Working Capital.* All assets included in Net Working Capital.<br><br>(e) *Intellectual Property.* All Intellectual Property and Software owned or controlled by Sellers or their Affiliates relating to the Business, including (i) all Transferred Registered Intellectual Property and (ii) those items listed on Section 2.1(e) of Sellers Disclosure Letter (collectively, the "**Transferred Intellectual Property**"), together with, in each case, (A) the right to collect royalties, products and proceeds in connection with any Transferred Intellectual Property, (B) all rights to sue for past, present or future infringement, misappropriation or other violation of any Transferred Intellectual Property, and all rights to recover (including for damages or lost profits) in connection therewith, (C) any associated goodwill and all other rights corresponding to any Transferred Intellectual Property in any jurisdiction, (D) any and all claims relating to any Transferred Intellectual Property (regardless of whether arising prior to, as of, or after the date hereof or known or unknown), and (E) all |

---

[4] The "**Business**" means the Sellers' business of the sale through showrooms and to showroom distributors of luxury floor and wall tiles and stone countertop slabs (as conducted as of the date of this Agreement but for all purposes excluding the Excluded Quartz Business), including specifically Walker Zanger's business and Surfaces' Anthology business.  APA § 2.1.

copies and tangible embodiments of any Transferred Intellectual Property;

(f) *Information Technology*. The Company Systems set forth on Section 2.1(f) of Sellers Disclosure Letter;

(g) *Books and Records*. All books, files, records, lists, studies, reports documents, data, correspondence (including email files), technical information, production data, quality control records and procedures, customer and user complaints and inquiry files, support logs and histories, research and development files and other printed or written materials and information (including any electronic format) including any information created, stored, or best utilized with computer technology of any type, including data, spreadsheets, calendars, networks, computer systems, archives, back-up or disaster recovery systems or discs, including data from collaboration tools, in each case, relating to the Business and business relations of the Business;

(h) *Governmental Authorizations*. All Governmental Authorizations and all pending applications therefor or renewals thereof, in each case to the extent transferable to Buyer and excluding Governmental Authorizations or pending applications therefor required for the continued operation of an Excluded Asset;

(i) *Personnel Records*. All personnel records (including Forms I-9) for Transferred Employees, to the extent not prohibited by Law;

(j) *Goodwill*. All goodwill in or associated with the Purchased Assets, payment intangibles and general intangible assets and rights relating to the Purchased Assets;

(k) *Claims*. Any and all claims of Sellers or any of their Affiliates to the extent related to or arising out of any Purchased Assets (and all proceeds of any settlement of such claims);

(l) *Trade Parties Avoidance Actions*.  All avoidance claims or causes of action available to Sellers under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (collectively, the "**Avoidance Actions**") against any of the Sellers' vendors, suppliers, customers or trade creditors with whom Buyer continues to conduct business in regard to the Purchased Assets after the Closing and any of their Affiliates (collectively, the "**Trade Parties**");

(m) *Other*. All other items listed on Section 2.1(m) of Sellers Disclosure Letter.

To the extent that any right, title or interest in or to any of the Purchased Assets is held by or under the control of any of Sellers' Affiliates, Sellers shall cause such Affiliates to promptly take such action as may be necessary to consummate the transfer to Buyer of such right, title and interest at the Closing on and subject to terms and conditions that are consistent with and subject to the terms of this Agreement.

| | |
|---|---|
| **Releases**<br><br>(APA § 7.14) | The APA contains customary mutual releases exchanged between the Parties:<br><br>From and after the Closing, each Party hereby knowingly, willingly, irrevocably and expressly waives and releases, on behalf of itself and its Affiliates and its and their respective Related Parties (collectively, the "**Releasors**"), to the fullest extent permitted by Law, any and all rights and claims (whether absolute or |

| | |
|---|---|
| | contingent, liquidated or unliquidated, known or unknown, determined, determinable or otherwise) that the Releasors may now or hereafter have against the other Party or any of its Affiliates or any of its or their respective Related Parties, or any of its or their respective financing sources, including any current, former or future lenders, equityholders, investors, co-investors, arrangers, underwriters, agents or representatives thereof (collectively, the "**Releasees**"), whether at law or in equity, relating to the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Retained Liabilities, this Agreement, any of the Transaction Documents or the subject matter hereof or the transactions contemplated hereby or thereby prior to the Closing, in each case except (a) as set forth in this Agreement, (b) as set forth in any Transaction Document or (c) for Fraud. From and after the Closing, the Releasors shall not bring any Action against the Releasees, whether at law or in equity, with respect to any of the rights or claims waived and released by the Releasors hereunder. |
| **Fiduciary Out; Private Sale**<br><br>(APA § 6.1) | The Debtors are seeking approval of a private sale.  The Debtors are not prevented from entertaining competing offers, and have the following fiduciary out in the APA:<br><br>Notwithstanding anything to the contrary in this Agreement, Sellers' obligations hereunder are subject in all respects to its fiduciary obligations under applicable Law to its bankruptcy estate, and nothing in this Agreement shall require any director, manager or officer of any Seller to take any action or refrain from taking any action to the extent taking or failing to take such action would be inconsistent with such Seller's fiduciary obligations under applicable Law. No action or inaction on the part of any director, manager or officer of a Seller that such director, manager or officer reasonably believes, after consultation with Sellers' counsel and financial advisors, is required by their fiduciary duties to such Seller shall be limited or precluded by this Agreement, including termination of this Agreement; provided, however, that no such action or inaction shall be deemed to prevent Buyer from exercising any termination rights it may have hereunder as a result of such action or inaction. |
| **Outside Closing Date and Other Milestones**<br><br>(APA § 6.1) | <u>Outside Closing Date</u>: Sixty (60) days from entry into the APA.<br><br><u>Chapter 11 Filing & Sale Motion</u>: The Bankruptcy Cases must be commenced, and this Motion must be filed, on or before July 8, 2025; provided, Buyer shall be deemed to waive such termination right if the Bankruptcy Cases are commenced and the motion for the Sale Order is filed prior to Buyer exercising its right to terminate the Agreement.<br><br><u>Sale Order</u>:  The Sale Order mut be entered by Bankruptcy Court within forty-five (45) days of the Petition Date; provided, Buyer shall be deemed to waive such termination right if the Sale Order is entered by the Bankruptcy Court prior to Buyer exercising its right to terminate the Agreement.<br><br><u>Financing-Related Milestones</u>: An Order approving the terms of a debtor-in-possession financing facility and related DIP Credit Agreement must be entered by the Bankruptcy Court on an interim basis within two (2) business days of the Petition Date and on a final basis within thirty (30) days of the Petition Date; provided, Buyer shall be deemed to waive such termination right if the applicable approval is entered by the Bankruptcy Court prior to Buyer exercising its right to terminate the Agreement. |
| **Termination Rights**<br><br>(APA § 6.1) | The APA may be terminated at any time on or prior to the Closing:<br><br>(a)  with the mutual written consent of Buyer and Sellers;<br><br>(b)  by either Buyer or Sellers if the Closing has not occurred within sixty (60) days following the date of this Agreement (the "**Outside Date**"); |

provided, however, that the right to terminate this Agreement under this Section (b) will not be available to any Party whose failure to fulfill any of its obligation under this Agreement was the primary cause of the failure of the Closing to occur on or prior to the Outside Date;

(c)  by Sellers, if Buyer breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of any of the conditions set forth in Section 2.10 and (ii) has not been, or is incapable of being, cured by Buyer by the Outside Date; provided, however, that the right to terminate this Agreement under this Section 6.1(b) will not be available to Sellers if it is then in breach of or has failed to perform any of its representations, warranties covenants or other agreements contained in this Agreement, which breach or failure to perform would give rise to the failure of any of the conditions set forth in Section 2.9;

(d)  by Buyer, if Sellers breached or failed to perform any of their representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of any of the conditions set forth in Section 2.9 and (ii) has not been, or is incapable of being, cured by Sellers by the Outside Date; provided, however, that the right to terminate this Agreement under this Section 6.1(d) will not be available to Buyer if it is then in breach of or has failed to perform any of its representations, warranties covenants or other agreements contained in this Agreement, which breach or failure to perform would give rise to the failure of any of the conditions set forth in Section 2.10;

(e)  by either Sellers or Buyer if any final, non-appealable Legal Restraint shall have been issued by any Governmental Authority that remains in effect and permanently prohibits or makes illegal the consummation of the transactions contemplated hereby; provided, however, that the right to effect a termination of the Agreement under this Section 6.1(e) shall not be available to any Party whose material breach of its representations, warranties, agreements or covenants hereunder has been the primary cause of such Legal Restraint;

(f)  by Buyer if (i) any Sellers consummate a sale of all or part of the Purchased Assets to a third Party other than Buyer, (ii) any Sellers seek to have the Bankruptcy Court enter, or the Bankruptcy Court enters, an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by any Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of any Sellers is appointed in the Bankruptcy Cases, (iii) an order for dismissal, conversion or appointment contemplated by the foregoing clause (ii) is entered by the Bankruptcy Court for any reason, (iv) any Seller enters into a definitive agreement for an Alternative Transaction with one or more Persons other than Buyer, (v) the Bankruptcy Court approves an Alternative Transaction, or (vi) any Seller consummates an Alternative Transaction;

(g)  by Buyer if an Order approving the terms of a debtor-in-possession financing facility and related DIP Credit Agreement is not entered by the Bankruptcy Court on an interim basis within two (2) Business Days of the Petition Date and on a final basis within 30 days of the Petition Date;

13

|  | provided Buyer shall be deemed to waive such termination right if the applicable approval is entered by the Bankruptcy Count prior to Buyer exercising its right to terminate the Agreement pursuant to this Section 6.1(g); |
|  | (h) by Buyer or Sellers if an Order of the Bankruptcy Court is entered denying approval of the Sale Order and such Order becomes final and non-appealable; |
|  | (i) by Buyer, upon the termination of the DIP Credit Agreement; |
|  | (j) by Buyer, if the Bankruptcy Cases are not commenced, or the motion for the Sale Order is not filed, on or before July 8, 2025; provided, Buyer shall be deemed to waive such termination right if the Bankruptcy Cases are commenced and the motion for the Sale Order is filed prior to Buyer exercising its right to terminate the Agreement pursuant to this Section 6.1(j); or |
|  | (k) by Buyer, if the Sale Order is not entered by Bankruptcy Court within 45 days of the date on which the Bankruptcy Cases are commenced; provided Buyer shall be deemed to waive such termination right if the Sale Order is entered by the Bankruptcy Court prior to Buyer exercising its right to terminate the Agreement pursuant to this Section 6.1(k). |
|  | Notwithstanding anything to the contrary in this Agreement, Sellers' obligations hereunder are subject in all respects to its fiduciary obligations under applicable Law to its bankruptcy estate, and nothing in this Agreement shall require any director, manager or officer of any Seller to take any action or refrain from taking any action to the extent taking or failing to take such action would be inconsistent with such Seller's fiduciary obligations under applicable Law. No action or inaction on the part of any director, manager or officer of a Seller that such director, manager or officer reasonably believes, after consultation with Sellers' counsel and financial advisors, is required by their fiduciary duties to such Seller shall be limited or precluded by this Agreement, including termination of this Agreement; provided, however, that no such action or inaction shall be deemed to prevent Buyer from exercising any termination rights it may have hereunder as a result of such action or inaction. |
| **Good Faith Deposit** | N/A. |
| **Interim Arrangements with Buyer** <br><br> (APA § 2.10(f)(iv)) | The APA does not contemplate any pre-Closing interim arrangements with the Buyer. <br><br> The APA contemplates and annexes a form Transition Services Agreement to be entered into for post-Closing transition services. |
| **Use of Proceeds** | The APA does not contain any provision pursuant to which the Debtors propose to release sale proceeds on or after the closing without further Court order, or to provide for a definitive allocation of sale proceeds between or among various sellers or collateral. |
| **Tax Exemption** | The APA does not contain any provision seeking to have the sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **Record Retention** <br><br> (APA § 5.4) | The APA provides that the Debtors will have access to books and records for at least seven years after Closing: <br><br> For at least seven years after the Closing, Buyer shall maintain the books and records (including financial and tax records and personnel files) |

| | |
|---|---|
| | included in the Purchased Assets, in each case, relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Sellers, and upon reasonable notice by Sellers, shall make the same available and afford Sellers and its Representatives reasonable access (including the right to make photocopies or electronic copies), during normal business hours, to such books and records.<br><br>The APA similarly provides that the Debtors will maintain non-transferred books and records for at least seven years after Closing, subject to an ability to dispose of such books and records on thirty (30) days' written notice to Buyer:<br><br>For at least seven years after the Closing, Sellers shall maintain the books and records (including financial and tax records and personnel files) related to the Excluded Assets or Retained Liabilities and related to the Business, in each case, relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Sellers, and upon reasonable notice by Buyer, shall make the same available and afford Buyer and its Representatives reasonable access (including the right to make photocopies or electronic copies), during normal business hours, to such books and records and to any personnel of Sellers with information pertaining to the Business, the Purchased Assets or the Assumed Liabilities after the Closing. Notwithstanding the foregoing, Sellers may dispose of any such books and records following the date that is thirty (30) days after Sellers have provided Buyer with written notice of such intention to dispose, during which period Buyer or any of its Affiliates may, at their sole cost and expense, remove and retain all or any part of such books and records as they may elect. |
| **Sale of Avoidance Actions**<br><br>(APA § 2.1(l)) | The APA provides for a limited sale of avoidance actions related to trade relationships that the Buyer intends to maintain:<br><br>*Trade Parties Avoidance Actions.* All avoidance claims or causes of action available to Sellers under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (collectively, the "**Avoidance Actions**") against any of the Sellers' vendors, suppliers, customers or trade creditors with whom Buyer continues to conduct business in regard to the Purchased Assets after the Closing and any of their Affiliates (collectively, the "**Trade Parties**").<br><br>All other avoidance actions will remain with the Debtors. |
| **Requested Findings as to Successor Liability**<br><br>(APA § 5.15; Proposed Order ¶ N) | The Parties intend that the Sale Transaction be free and clear of successor liability to the fullest extent permitted by law, including free and clear of any Stone Countertop Liabilities.<br><br>The APA provides the following in respect of successor liability:<br><br>The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the closing, Buyer shall not be deemed to: (a) be the successor of any Sellers; (b) have, de facto, or otherwise, merged with or into any Sellers; (c) be a mere continuation or substantial continuation of any Sellers or the enterprise(s) of any Sellers; or (d) be liable or have any Liability for any acts or omissions of any Sellers in the conduct of the Business or arising under or related to the Purchased Assets other than as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided |

| | |
|---|---|
| | in this Agreement, the Parties intend that Buyer shall have no Liability for any Lien (other than the Assumed Liabilities and Permitted Liens on the Purchased Assets) against any Sellers or any of such Sellers' predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated by this Agreement, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any Liability of any Sellers arising prior to, or relating to any period occurring prior to, the Closing Date. The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this <u>Section 5.15</u>, to the maximum extent permitted by Law.<br><br>The Proposed Order provides the following in respect of successor liability:<br><br>The Buyer Parties are not a "successor" to, a mere continuation of, or alter ego of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Buyer Parties and the Debtors.  Moreover, the Buyer Parties are not holding themselves out to the public as successor to or a continuation of the Debtors or their estates. The Buyer Parties are not a successor to any of the Debtors or their estates by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, succession, merger, or *de facto* merger of any of the Buyer Parties and the Debtors.  Immediately prior to the Closing, no common identity of directors or controlling stockholders existed between the Debtors and the Buyer Parties.  The transfer of the Purchased Assets to the Buyer, and the assumption of the Assumed Liabilities by the Buyer, except as otherwise explicitly set forth in the APA, does not, and will not, subject the Buyer Parties to any liability whatsoever with respect to the Debtors or the operation of the Debtors' businesses prior to the Closing or by reason of such transfer, including under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly, on any, or any theory of, successor, vicarious, antitrust, environmental, revenue, pension, ERISA, tax, labor (including any WARN Act), employment or benefits, *de facto* merger, business continuation, substantial continuity, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, products liability, or other applicable law, rule, or regulation (including filing requirements under any such law, rule, or regulation), or theory of liability, whether legal, equitable, or otherwise (collectively, the "**Successor or Other Liabilities**").  Pursuant to the APA, the Buyer shall have no liability for the Retained Liabilities. |
| **Sale Free and Clear**<br><br>(APA § 5.14; Proposed Order ¶¶ U–V) | On the Closing Date, the Purchased Assets shall be transferred to the Buyer free and clear of all obligations, Liabilities and Liens, other than Permitted Liens and the Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.<br><br>The APA provides the following in respect of a "free and clear" sale:<br><br>Sellers acknowledge and agree, and the Sale Order shall provide that, except as otherwise provided in Section 2.3, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Liens of, against or created by such Sellers or their bankruptcy estate, to the fullest extent permitted by Section 363 of |

|  | the Bankruptcy Code and otherwise applicable Law, shall be fully released from and with respect to the Purchased Assets. On the Closing Date, the Purchased Assets shall be transferred to Buyer free and clear of all obligations, Liabilities and Liens, other than Permitted Liens and the Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code and otherwise applicable Law.

The Proposed Order provides the following in respect of a "free and clear" sale:

The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full such that the Sale Transaction and any transfer or purchase of the Purchased Assets will be free and clear of any Encumbrances.

The Debtors may transfer or sell the Purchased Assets free and clear of all Encumbrances against the Debtors, their estates, or any of the Purchased Assets (except to the extent expressly set forth in the APA) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Those holders of Encumbrances who did not object or who withdrew their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Subject to the terms and conditions of this Sale Order, all holders of Encumbrances are adequately protected by either (i) having their Encumbrances, if any, in each instance against the Debtors, their estates, or the Purchased Assets, attach to the net cash proceeds of the Purchase Price ultimately attributable to the Purchased Assets in which such creditor alleges Encumbrances in the same order of priority, with the same validity, force, and effect that such Encumbrances had prior to the Sale Transaction, subject to any claims and defenses the Debtors and their estates may possess with respect thereto, or (ii) fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code. |
| **Credit Bid** | The proposed Sale Transaction is not a credit bid. |
| **Relief from Fed. R. Bankr. P. 6004(h) and 6006(d)** | The Proposed Order seeks a waiver of the 14-day stays imposed by Bankruptcy Rules 6004(h) and 6006(d). The Proposed Order provides:

This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding the applicability of any provisions of the Bankruptcy Rules, including Bankruptcy Rules 6004(h), 6006(d), and 7062, or any other provisions of the Bankruptcy Rules or Local Rules stating the contrary, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby waived and shall not apply. Time is of the essence in closing the Sale Transaction and the other transactions contemplated by the APA, and the Debtors and the Buyer intend to close the Sale Transaction and the other transactions contemplated by the APA as soon as practicable. |

## III.   Notice of the Sale

22.    The Debtors intend to undertake a comprehensive noticing campaign for the benefit of all interested parties and stakeholders.  To provide actual notice to known creditors and

known potential creditors, the Debtors will serve notice of the Sale Transaction, substantially in the form attached hereto as **Exhibit C** (the "Sale Notice"), on the Debtors' entire creditor matrix, along with any party that expressed an interest in purchasing the Debtors' assets in connection with the Debtors' prepetition marketing process.  The creditor matrix includes:

- Trade creditors, including vendors and suppliers;
- Current and former employees, contractors, recipients of pensions or other retirement benefits, and current and former officers and directors;
- Federal, state, and local taxing authorities;
- Parties who the Debtors know have asserted a lien on the Debtors' property;
- Banks where the Debtors hold deposit accounts, and all banks that have issued letters of credit to the Debtors;
- Counterparties to the Debtors' contracts and leases, including real property leases, personal property leases, and equipment leases, as well as intellectual property licenses;
- Utility companies that service the Debtors' operating locations;
- The Debtors' insurance providers, brokers, servicers, and financiers;
- Known litigation counterparties, including plaintiffs in pending lawsuits or judgments pending against the Debtors and claimants with currently pending workers' compensation claims;
- Equity holders;
- Regulatory agencies that oversee the Debtors' businesses; and
- The Debtors' professionals, including retained and ordinary course professionals.

23.      In addition, to provide notice to unknown creditors, the Debtors will publish notice, substantially in the form attached hereto as **Exhibit D** (the "Publication Notice") in a leading national circulation publication such as *The New York Times*, *USA Today*, or *The Wall Street Journal*.  The Debtors also will publish the Publication Notice in Spanish in a leading national circulation Spanish-language publication such as *La Opinión*.

24.      The Sale Notice and Publication Notice each detail, among other things: (i) that the proposed Sale Transaction contemplates a sale free and clear of all liens, claims, and encumbrances, including successor liability, and that customers' personally identifiable information may be sold in accordance with the Debtors' applicable privacy policies; (ii) important

deadlines, including the date, time, and location of the Sale Hearing, and the deadline to object to

the Sale Transaction; (iii) instructions for submitting objections to the Sale Transaction and

consequences of failing to timely object; and (iv) how to access free versions of all relevant

documents, as well as the docket for these chapter 11 cases, on the Debtors' case information

website.

   25. In addition, the Sale Notice and Publication Notice explicitly provide in

bold text that:

> **The Debtors are proposing to sell the Purchased Assets free and clear of all liens, claims, Encumbrances, and other interests (other than Permitted Liens (as defined in the APA)). In connection with the Sale Transaction, the Buyer will also be seeking a finding from the Court that they are not liable under theories of "successor liability" for any Successor or Other Liabilities, including, without limitation, any liens, claims, Encumbrances, and other interests of any kind whatsoever arising under any theory of liability, whether legal, equitable, or otherwise, whether known or unknown, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, manifested or unmanifested, in each case, based on or relating to, or in any manner arising from, in whole or in part (i) the Debtors' stone products (including engineered stone products), including, for the avoidance of doubt, the sourcing, manufacturing, transportation, fabrication, cutting, sawing, marketing, sale, distribution, and all other business activities related thereto (collectively, the "<u>Stone Countertop Activities</u>"), regardless of whether the Stone Countertop Activities were carried out directly by any of the Debtors or by an employee, affiliate, contractor, supplier, vendor, representative, or agent thereof, (ii) any pending or threatened legal actions involving the Stone Countertop Activities or alleged silicosis or other respiratory or other injury, and (iii) any other involvement in the subject matter of the Stone Countertop Activities (collectively, the "<u>Stone Countertop Liabilities</u>"). For the avoidance of doubt, any and all liens, claims, Encumbrances, or other interests of any kind whatsoever arising from the Stone Countertop Activities, including those related to alleged exposure to hazardous materials and any related lung or other disease, shall be Retained Liabilities, which shall remain obligations of the Debtors' estates and be dealt with in the chapter 11 cases, including through any chapter 11 plan and associated creditor trust or similar mechanism, and any holder of any such**

**liability shall have no recourse against or other right to payment from any Buyer Party under any circumstances.**

26.     Copies of the Sale Notice will be sent to known creditors and parties in interest at least 21 days before the Sale Hearing consistent with Bankruptcy Rule 2002(a)(2). To the maximum extent practicable, the Publication Notice will be published in its various circulations at least 21 days prior to the Sale Hearing.

27.     The Debtors submit that the foregoing notice complies with the Bankruptcy Code, the Bankruptcy Rules, and due process, and is otherwise good, sufficient and proper.

## IV.     The Assumption and Assignment Notice Process

28.     The Debtors and the Buyer have worked to identify executory contracts and unexpired leases that the Debtors may assume and assign to the Buyer as part of the Sale Transaction (such contracts and leases, the "Transferred Contracts").  The Debtors have prepared a notice of assumption and assignment, attached hereto as **Exhibit E** (the "Contract Notice") and, included therewith, a list (the "Contracts Schedule")[5] of (i) the Transferred Contracts that may be assigned to the Buyer as part of the Sale Transaction and (ii) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Transferred Contract (the "Cure Amounts"). The Contract Notice also includes instructions on how a contract counterparty can request information from the Buyer regarding adequate assurance of future performance.

29.     The Debtors propose to serve via first-class mail and email (where available) a copy of the Contracts Notice with the Contracts Schedule attached thereto (or a customized version thereof for the applicable recipient) that will, among other things: (i) alert the

---

[5]     For the avoidance of doubt, the failure to list a contract on the Contracts Schedule is not intended to be and shall not be deemed an admission that such contract that the omitted contract is not executory and therefore not subject to assumption and assignment.

recipient in bold print that their contract may be subject to assumption and assignment and their rights may be affected by the proposed Sale Transaction; (ii) detail important deadlines, including the date, time, and location of the Sale Hearing, and the deadline to object to the Sale Transaction, how to request information on adequate assurance of future performance, the proposed assumption and assignment of the Transferred Contract, and the Cure Amount (collectively, an "<u>Objection</u>"); (iii) provide instructions for submitting Objections and the consequences of failing to timely object; and (iv) explain how to access free versions of all relevant documents, as well as the docket for these chapter 11 cases, on the Debtors' case information website.

30.     The Contract Notice will be sent to every counterparty to a Transferred Contract to allow at least 21 days' notice of the Sale Hearing, consistent with the Bankruptcy Rules.

31.     The Debtors submit that the foregoing notice complies with the Bankruptcy Code, the Bankruptcy Rules, and due process, and is otherwise good, sufficient and proper.

**V.      The Debtors' Relevant Privacy Policies**

32.     Walker Zanger's and Anthology's privacy policies permit the transfer of customer data in connection with a sale of substantially all their assets or business.   Walker Zanger's privacy policy, available at https://www.walkerzanger.com/privacy-policy/, provides in relevant part that:

> The Company may use Personal Data for the following purposes:
>
> * * *
>
> **For business transfers:**  We may use Your information to evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of Our assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which Personal Data held by Us about our Service users is among the assets transferred.

We may share Your personal information in the following situations:

\* \* \*

**For business transfers:** We may share or transfer Your personal information in connection with, or during negotiations of, any merger, sale of Company assets, financing, or acquisition of all or a portion of Our business to another company.

\* \* \*

If the Company is involved in a merger, acquisition or asset sale, Your Personal Data may be transferred. We will provide notice before Your Personal Data is transferred and becomes subject to a different Privacy Policy.

Anthology's privacy policy, available at https://anthologytile.com/privacy-policy/, contains identical language.

## BASIS FOR RELIEF

I.     **The Debtors' entry into the APA and consummating the Sale Transaction represent a sound exercise of the Debtors' business judgment.**

33.     Section 105(a) of the Bankruptcy Code provides: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In determining whether to authorize the use, sale, or lease of property of the estates under section 363 of the Bankruptcy Code, "courts require the debtor to show that a sound business purpose justifies such actions." *The Dai-Ichi Kangyo Bank Ltd. V. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *see, e.g.*, *In re ICL Holding Co., Inc.*, 802 F.3d 547, 551 (3d Cir. 2015); *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983). The "sound business purpose" test requires a debtor to establish that: "(1) a sound business purpose [for the sale] exists;

(2) the [total consideration] is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith." *In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  The Debtors submit that the Sale Transaction satisfies each of these elements.

34.      Once a debtor articulates a valid business justification, then the burden of rebutting the "strong presumption . . . that the agreement at issue was negotiated in good faith and in the best interests of the estate" falls to parties opposing the transaction. *In re Filene's Basement*, No. 11-13511 (KJC), 2014 WL 1713416; *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  Thus, if a debtor satisfies the business judgment rule, the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

35.      Here, the Debtors' entry into the APA is a sound exercise of their business judgment because the APA provides for a value-maximizing going concern sale that is the highest and best offer available for the Purchased Assets.  The Debtors' entry into the APA follows years of extensive marketing efforts for the Debtors' businesses and will bring approximately $17.5 million of liquidity into the estates, subject to certain adjustments, while simultaneously reducing operating liabilities.  This consideration is higher or otherwise better than any actionable transaction, particularly any going concern transaction, available in the marketplace.  As described in the First Day Declaration and the Sale Declaration, the Debtors do not have the liquidity to sustain ongoing operations of the Walker Zanger and Anthology businesses.  Accordingly, if the Sale Transaction is not approved, the Debtors will be forced to liquidate the businesses, which will destroy value, result in lost jobs, and drastically increase liabilities of the Debtors' estates.

36. For these reasons, the Debtors submit that their decision to enter into the APA and consummate the Sale Transaction with the Buyer represents a sound exercise of the Debtors' business judgment, such that the Sale Transaction should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.

## II. Approving the Sale Transaction as a private sale is warranted under the circumstances.

37. As described above and in the Sale Declaration, the Debtors engaged in significant prepetition marketing of the Purchased Assets over the course of more than three years, including with the help of the Debtors' former investment banker, Harris Williams. The Debtors' businesses—including the Walker Zanger business and the Surfaces' Anthology business—have been subjected to an exhaustive prepetition marketing process, during which over 100 potential bidders were contacted and bidders were invited to submit bids for the Debtors' businesses as a whole or on a standalone basis. The Debtors believe that a postpetition bidding and auction for the Purchased Assets would require the Debtors' estates to incur substantial additional costs and create undue delay and do not believe that such a process would result in incremental value sufficient to justify the additional costs and delay, particularly in light of the Debtors' timing and liquidity constraints.

38. Given the more than three years of extensive marketing efforts, the Debtors do not believe that additional marketing or an auction process would be likely to yield a materially better offer. Moreover, given the Debtors' liquidity position, the Debtors simply cannot afford a drawn-out sale process. Indeed, based on the Debtors' current projections, they need to close on the Sale Transaction by August 22, 2025, so as to avoid a liquidity wall and preserve value to pursue a liquidating plan for the benefit of all stakeholders. Absent approval and closing under the APA, the Debtors will be unable to sustain operations and will be forced to liquidate, to the

detriment of all their stakeholders.  In contrast, approving and closing the Sale Transaction by August 22, 2025, preserves the Walker Zanger and Anthology businesses as going concerns, preserves at least 140 jobs, maintains continued trade relationships with hundreds of vendors, customers, and other parties, and maximizes value of the Debtors' estates for the benefit of all stakeholders.

39.     The Debtors submit that the comprehensive noticing campaign, combined with the lengthy objection period and exhaustive prepetition marketing process, render any postpetition marketing or auction process unnecessary, costly, and wasteful of estate resources. Accordingly, the Debtors believe that pursuing a private sale in the manner described herein is warranted under the circumstances. *See, e.g.*, *In re Franchise Grp. Inc.*, No. 24-12480 (LSS) (Bankr. D. Del. May 7, 2025) (authorizing a private sale of certain of the debtors' assets without bidding procedures or an auction); *In re Sunpower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 29, 2024) (same); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Mar. 11, 2024) (same); *In re Fulcrum BioEnergy, Inc.*, 24-12008 (TMH) (Bankr. D. Del. Apr. 24, 2025) [D.I. 564] (approving private sale of stock interests in subsidiary on 13 days' notice of the objection deadline and 20 days' notice of the sale hearing); *In re ExpressJet Airlines, LLC*, No. 22-10787 (MFW) (authorizing the private sale substantially all the Debtors' airline parts and warehouse lease on 14 days' notice of the objection deadline and 21 days' notice of the sale hearing); *In re Armstrong Flooring, Inc.*, No. 22-10426 (MFW) (Bankr. D. Del. Mar. 27, 2023) (authorizing private sale of Debtors' real property on 14 days' notice of the objection deadline and 19 days' notice of the sale hearing); *In re Indep. Pet Partners Holdings, LLC*, No. 23-10153 (LSS) (Bankr. D. Del. Feb. 24, 2023) (authorizing private sale of lease assets over objection on eight days' notice of the objection deadline and sale hearing deadline); *In re Boy Scouts of Am.*,

No. 20-10343 (LSS) (Bankr. D. Del. Apr. 22, 2022) (approving private sale of real property on 14

days' notice of the objection deadline and 21 days' notice of the sale hearing).

### III.    The sale of the Purchased Assets free and clear of liens and other interests is authorized by section 363(f) of the Bankruptcy Code.

40.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free

and clear of liens, claims, interests, and encumbrances if:

> (1)    applicable non-bankruptcy law permits sale of such property free and clear of such interests;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because these requirements are listed in the disjunctive, the Debtors only need

to satisfy one of the five requirements to permit the Purchased Assets to be sold "free and clear"

of liens and interests.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002).

The Debtors submit that each lien or interest in the Purchased Assets satisfies at least one of the

five conditions of section 363(f) of the Bankruptcy Code, and that any such lien or interest will be

adequately protected by either being paid in full at the time of closing or by attaching to the net

proceeds of the Sale Transaction, subject to any claims and defenses the Debtors may possess with

respect thereto.

41.    Further, to the extent any prepetition secured lenders have a prepetition

security interest in and liens upon the Purchased Assets, those creditors can be compelled to accept

a monetary satisfaction of their interests or are adequately protected by having their claims that

constitute interests in the Purchased Assets, if any, attach to the proceeds of the Sale Transaction with the same priority that existed immediately prior to the closing.

42.     Thus, section 363(f)(5) of the Bankruptcy Code is satisfied and any existing interests in the Purchased Assets will be adequately protected through attachment to the proceeds of the Sale Transaction.  *See In re Katy Indus.*, No. 17-11101 (KJC), 2017 WL 5434578, at *5 (Bankr. D. Del. 2017) (finding that holders of liens against property sold free and clear of all liens are "adequately protected by having their Encumbrances, if any, attach to the cash proceeds of the Sale attributable to the Purchased Assets in which such holder alleges an Encumbrance"); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.").  Accordingly, the Debtors request that the Purchased Assets be transferred to the Buyer free and clear of liens, claims, and Encumbrances, with any such liens, claims, and Encumbrances attaching to the net proceeds realized from the Sale Transaction.

**IV.     The Buyer is a good-faith purchaser and is entitled to the full protection of section 363(m) of the Bankruptcy Code.**

43.     Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith[.]"  11 U.S.C. § 363(m).  Although good faith is not specifically defined in the Bankruptcy Code, one court has stated that the "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings . . . A purchaser's good faith is lost by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re Gucci*, 126 F.3d

380, 390 (2d Cir. 1997) (internal quotations omitted).  Within the Third Circuit, a good faith purchaser is one who purchases assets for value and in good faith.  "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986).

44.    The APA and the Sale Transaction contemplated herein are the product of good-faith, arm's-length negotiations.  There is no indication of fraud or any improper insider dealing.  The consideration to be received by the Debtors pursuant to the APA is substantial, fair, and reasonable under the circumstances.  As noted, the Debtors' businesses have been exhaustively marketed.  No other buyer emerged with an actionable transaction for the Purchased Assets at a superior value.

45.    The Debtors submit that the Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and that the APA is a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.  Moreover, neither the Buyer nor the Guarantor are "insiders" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  Finally, the Debtors are not aware of any indication of fraud or collusion between any of the bidders that participated in the prepetition marketing process or any similar conduct that would taint the sale process for the Purchased Assets.  Upon information and belief, none of the Debtors, the Buyer, the Guarantor, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct

that would cause or permit the consummation of the Sale Transaction or any other transactions contemplated by the APA to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

46.    Based on the foregoing, the Debtors request that the Court enter an order entitling each of the parties to the Sale Transaction to the full protections of section 363(m) of the Bankruptcy Code.

**V.    The Buyer has not engaged in any conduct to control the sale price under section 363(n) of the Bankruptcy Code.**

47.    The Sale Transactions, including, but not limited to, the marketing and sale process engaged in by the Debtors and the Buyer and entry into the APA, are non-collusive, in good faith, from arm's-length bargaining positions, and substantively and procedurally fair to all parties in interest.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the APA or the Sale Transaction to be avoided, or for any costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

48.    As described in the Sale Declaration, the APA is the product of extensive, hard-fought and arm's-length negotiations.  The Buyer did not in any way unfairly influence the Debtors or the sale process, nor did the Buyer act in any way to control the price of the Sale Transaction.  The Debtors believe that the Sale Transaction represents fair value for the Purchased Assets.  As noted, the Debtors' businesses have been exhaustively marketed.  No other buyer emerged with an actionable transaction for the Purchased Assets at a superior value.  Therefore, the Debtors submit that the Sale Transaction represents the highest or otherwise best offer for the Purchased Assets.

**VI.    The Debtors have met the requirements of section 365 of the Bankruptcy Code to assume and assign the Transferred Contracts.**

49.     Assumption of contracts in connection with a sale is an essential element in a debtor's ability to maximize the value of its assets—and particularly so when a contract is integral to the ownership or operation of the business to be acquired.  The ability to assume and assign contracts will also increase the likelihood that a debtor will be able to sell the assets as a going concern, thereby avoiding needless value-destruction through a liquidation.

50.     Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or an unexpired lease.  *See, e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment . . . ."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice).  In this context, the business judgment test only requires that a debtor demonstrates that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

51.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract pursuant to section 365(f) of the Bankruptcy Code.  *See In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) (noting that the Bankruptcy Code "generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).  Section

365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts irrespective of anti-assignment restrictions, providing, in relevant part:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1).  Section 365(f)(3) of the Bankruptcy Code also prohibits enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  11 U.S.C. § 365(f)(3); *see, e.g.*, *In re Jamesway Corp.*, 201 B.R. 73, 77–78 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy Code prohibits enforcement of any lease clause creating a right to terminate the lease because it is being assumed or assigned, thereby indirectly barring assignment by a debtor).  Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced.  *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.").

52.     A debtor and the proposed buyer are required to provide adequate assurance of future performance for the debtor to assign an executory contract.  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *In re Sanshoe Worldwide Corp.*, 139 B.R. 585, 592 (S.D.N.Y. 1992), *aff'd,* 993 F.2d 300 (2d Cir. 1993); *see also In re Decora Indus. Inc.*, Case No. 00-4459 (JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guaranty of payment."); *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J.

1988) (adequate assurance "will fall considerably short of an absolute guarantee of performance") (quoting *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980)).

53.     For instance, adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g.*, *In re ANC Rental Corp., Inc.*, 278 B.R. 714, 724 (Bankr. D. Del. 2002) (adequate assurance is present where prospective assignee hired personnel with experience running debtors' business and presented evidence of its financial security); *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

54.     Here, the Contract Notice provides information on how each affected counterparty may request information on adequate assurance of future performance from the Buyer.  Moreover, the Buyer is a well-capitalized and well-established player in the industry that has the financial and operational wherewithal to perform under the Transferred Contracts, and the Buyer is prepared to demonstrate such at the Sale Hearing or any other hearing on assumption and assignment of a Transferred Contract.

55.     The Debtors' assumption and assignment of the Transferred Contracts to the Buyer meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code.  The assumption and assignment of key executory contracts and unexpired leases is essential to securing the highest or otherwise best offer for the Purchased Assets and necessary for the Buyer to conduct the Debtors' businesses going forward.

56.     To the extent that any defaults exist under any Transferred Contract, the Buyer or the Debtors, as applicable, will cure any such default prior to such assumption and assignment, and provide adequate assurance of future performance.

57.     Accordingly, the Debtors submit that assumption and assignment of the Transferred Contracts is appropriate in these cases.

## VII.     The Sale Transaction does not require appointment of a consumer privacy ombudsman.

58.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell personally identifiable information about individuals unless the sale is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.  Section 101(41A) of the Bankruptcy Code defines "personally identifiable information" as an individual's name, residence address, email address, telephone number, social security number or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual."  11 U.S.C. § 101(41A).  The Purchased Assets include customer lists of the Sellers, which include certain of the aforementioned information.  *See* APA § 2.1 (including all "Intellectual Property" owned or controlled by the sellers as included in the Purchased Assets); *id.* § 1.1 (defining "Intellectual Property" as including customer lists).  Here, any customer information sold to the Buyer will only be sold and used in accordance with the Debtors' applicable privacy policies.  Therefore, appointment of a consumer privacy ombudsman is unnecessary.

59.     As noted above, the Debtor Sellers' privacy policies permit the transfer or sale of personally identifiable information to third parties in connection with mergers, asset sales, and other transactions.  Therefore, the Sale Transaction complies with section 363(b)(1)(A) of the Bankruptcy Code, and no consumer privacy ombudsman is required.

## VIII.   Relief under Bankruptcy Rules 6004(h) and 6006(d) is appropriate.

60.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Proposed Order be effective immediately upon its entry by providing that the fourteen day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

61.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *In re Filene's Basement*, 2014 WL 1713416 at *14; *see* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."  10 *Collier on Bankruptcy* ¶ 6004.11, ¶ 6004.04 (16th rev. ed. 2014).

62.     As discussed above, the Debtors require the ability to immediately close on the Sale Transaction so as to avoid the risk of liquidation.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## <u>NOTICE</u>

63.     Notice of this Motion is being provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to Truist Bank; (c) counsel to Oaktree Fund Administration, LLC; (d) all known creditors, including all litigation counterparties and all the

parties listed on the Debtors' creditor matrix; (e) any party that the Debtors know has a statutory lien on the Debtors' property; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Purchased Assets; (g) any party that has expressed an interest in purchasing the Debtors' assets in connection with the Debtors' prepetition marketing process; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtors request entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A,** (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated: July 8, 2025
      Wilmington, Delaware      **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Sophie Rogers Churchill*
Derek C. Abbott (No. 3376)
Matthew B. Harvey (No. 5186)
Sophie Rogers Churchill (No. 6905)
Avery Jue Meng (No. 7238)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: dabbott@morrisnichols.com
      mharvey@morrisnichols.com
      srchurchill@morrisnichols.com
      ameng@morrisnichols.com

*Proposed Counsel to the Debtors and Debtors in Possession*