## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| MOSAIC COMPANIES, LLC, *et. al.*, | Case No. 25-11296 (CTG) |
| Debtors.[1] | Jointly Administered |

## DISCLOSURE STATEMENT FOR
## JOINT CHAPTER 11 PLAN OF LIQUIDATION

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Derek C. Abbott (No. 3376)
Matthew B. Harvey (No. 5186)
Sophie Rogers Churchill (No. 6905)
Avery Jue Meng (No. 7238)
1201 Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: dabbott@morrisnichols.com
        mharvey@morrisnichols.com
        srchurchill@morrisnichols.com
        ameng@morrisnichols.com

*Counsel to the Debtors and Debtors in Possession*

---

**THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR TO AND UP TO THE DISCLOSURE STATEMENT HEARING.**

---

Dated: August 5, 2025
        Wilmington, Delaware

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Mosaic Companies, LLC (0759); Surfaces Southeast HoldCo, LLC (8822); Mosaic Midco, LLC (07590; Retile, LLC (7285); Wallec Enterprises, LLC (4482); CAYP, LLC (6869); Surfaces Southeast, LLC (9283); Walker & Zanger, LLC (6215); WZCA Holdings, LLC (9859); Mustang Stone Quarries, LLC (9922). The Debtors' mailing address is 400 Technology Ct. Ste R. Smyrna, GA 30082.

This Disclosure Statement contains only a summary of the Plan. The Disclosure Statement is not intended to replace careful and detailed review and analysis of the Plan, but to aid and supplement such review. This Disclosure Statement is qualified in its entirety by reference to the more detailed provisions set forth in the Plan (which is included as <u>Exhibit A</u> to this Disclosure Statement). In the event of a conflict between the Plan and the Disclosure Statement, the provisions of the Plan will govern. All holders of Claims and Interests are encouraged to review the full text of the Plan and to read carefully this entire Disclosure Statement, including all exhibits annexed hereto, before deciding whether to vote to accept or reject the Plan.

The statements contained in this Disclosure Statement are made as of the date hereof, and the delivery of this Disclosure Statement will not, under any circumstances, create any implication that the information contained herein is correct at any time after the date hereof.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure. Dissemination of this Disclosure Statement is controlled by Bankruptcy Rule 3017. This Disclosure Statement was prepared to provide parties in interest in these Chapter 11 Cases with "adequate information" (as defined in section 1125 of the Bankruptcy Code) so that those creditors who are entitled to vote with respect to the Plan can make an informed judgment regarding such vote on the Plan.

Holders of Claims and Interests should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice. Each such holder should, therefore, consult with his or her own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan and the transactions contemplated thereby.

Information contained herein is subject to completion or amendment. The Debtors reserve the right to file an amended plan and related disclosure statement from time to time, subject to the terms of the Plan. This Disclosure Statement does not constitute an offer to sell, or the solicitation of an offer to buy, any securities.

The effectiveness of the Plan is subject to several conditions precedent. There is no assurance that these conditions will be satisfied or waived.

No person has been authorized by the Debtors in connection with the Plan or the solicitation to give any information or to make any representation other than as contained in this Disclosure Statement, the Plan and the Exhibits, Notices and Schedules attached to or incorporated by reference or referred to in this Disclosure Statement and/or the Plan, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.

Except where specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles.

TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

    A. General ..........................................................................................................1

    B. Disclosure Statement Enclosures ..................................................................2

II.     FREQUENTLY ASKED QUESTIONS .............................................................3

    A. What is Chapter 11? .......................................................................................3

    B. What is a Plan? ..............................................................................................3

    C. What is a Disclosure Statement? ...................................................................3

    D. How does a Creditor Vote? ...........................................................................4

    E. Confirmation Hearing ....................................................................................6

    F. Recommendation of the Debtors ...................................................................6

III.    OVERVIEW OF THE PLAN ...............................................................................6

IV.     BACKGROUND OF THE DEBTORS AND CERTAIN EVENTS PRECEDING
    THE FILING OF THEIR CHAPTER 11 CASES ..............................................9

    A. General Background and History ...................................................................9

    B. Events Leading to the Chapter 11 Cases ....................................................11

    C. The Debtors' Prepetition Corporate Structure ............................................12

    D. The Debtors' Prepetition Capital Structure ................................................13

V.      EVENTS DURING THE CHAPTER 11 CASES .............................................14

    A. Commencement of the Chapter 11 Cases ...................................................14

    B. First-Day Relief ...........................................................................................14

    C. [Rejection of Executory Contracts and Unexpired Leases and Abandonment of
    Burdensome Assets .....................................................................................17

    D. Schedules of Assets and Liabilities and Statements of Financial Affairs, and
    Establishment of Bar Dates .........................................................................17

    E. The Debtors' Postpetition Financing ..........................................................18

    F. The Debtors' Sale Process ...........................................................................19

        1. The Artivo Sale .....................................................................................19

        2. Prepetition Marketing ...........................................................................20

        3. Sale Hearing and Entry of Sale Orders .................................................21

        4. The Debtors' Remaining Businesses .....................................................21

    G. Independent Director Investigation ..............................................................21

VI.     PLAN ....................................................................................................................21

    A. Overview of the Plan ...................................................................................21

B.  Administrative Expense and Priority Claims.................................................................22

    1.  Administrative Expense Claims................................................................................22

    2.  Fee Claims ................................................................................................................22

    3.  Priority Tax Claims..................................................................................................24

    4.  U.S. Trustee Fees .....................................................................................................24

    5.  Restructuring Expenses............................................................................................24

C.  Classification of Claims and Interests.........................................................................25

    1.  Classification in General..........................................................................................25

    2.  Formation of Debtor Groups for Convenience Only ...............................................25

    3.  Summary of Classification.......................................................................................25

    4.  Special Provision Governing Unimpaired Claims....................................................26

D.  Treatment of Claims and Interests ..............................................................................26

E.  Means for Implementation...........................................................................................28

    1.  Joint Chapter 11 Plan ..............................................................................................28

    2.  Plan Funding ............................................................................................................28

    3.  Liquidating Trust .....................................................................................................29

    4.  Elimination of Duplicate Claims .............................................................................32

    5.  Corporate Action......................................................................................................33

    6.  Directors, Officers, Managers, Members and Authorized Persons of the Debtors...33

    7.  D&O Policy ..............................................................................................................33

    8.  Indemnification of Managers, Directors, Officers, and Employees .........................33

    9.  Withholding and Reporting Requirements ...............................................................34

    10. Exemption From Certain Transfer Taxes .................................................................34

    11. Effectuating Documents; Further Transactions ........................................................35

    12. Preservation of Rights of Action..............................................................................35

    13. Closing of the Chapter 11 Cases ..............................................................................35

F.  Distributions.................................................................................................................36

    1.  Distribution Record Date .........................................................................................36

    2.  Date of Distributions................................................................................................36

    3.  Delivery of Distributions .........................................................................................36

    4.  Manner of Payment Under Plan................................................................................36

    5.  Minimum Cash Distributions...................................................................................37

    6.  Setoffs ......................................................................................................................37

    7.  Allocation of Distributions Between Principal and Interest .....................................37

8. No Postpetition Interest on Claims ...................................................................37

9. No Distribution in Excess of Amount of Allowed Claim...................................37

G. Procedures for Disputed Claims .................................................................................38

1. Objections to Claims..........................................................................................38

2. Allowance of Claims..........................................................................................38

3. Estimation of Claims..........................................................................................38

4. No Distributions Pending Allowance .................................................................38

5. Resolution of Claims..........................................................................................38

6. Amendments to Claims and Late Filed Claims .................................................39

H. Executory Contracts and Unexpired Leases ................................................................39

1. Rejection of Executory Contracts and Unexpired Leases...................................39

2. Claims Based on Rejection of Executory Contracts and Unexpired Leases ...........39

3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ...........40

4. Modifications, Amendments, Supplements, Restatements, or Other Agreements ...40

5. Reservation of Rights.........................................................................................41

I. Conditions Precedent to the Effective Date .................................................................41

1. Conditions Precedent to the Effective Date .......................................................41

2. Waiver of Conditions Precedent ........................................................................42

3. Substantial Consummation ................................................................................42

5. Effect of Vacatur of Confirmation Order...........................................................42

J. Settlement, Releases, Injunctions, and Related Provisions...........................................43

1. Release of Liens .................................................................................................43

2. Binding Effect....................................................................................................43

3. Term of Injunctions or Stays..............................................................................43

4. Releases by the Debtors .....................................................................................43

5. Exculpation .......................................................................................................44

6. Injunction ..........................................................................................................44

K. Retention of Jurisdiction .............................................................................................45

L. Miscellaneous Provisions............................................................................................47

1. No Revesting of Assets ......................................................................................47

2. Subordinated Claims ..........................................................................................47

3. Payment of Statutory Fees .................................................................................47

4. Amendments ......................................................................................................48

5. Revocation or Withdrawal of the Plan................................................................48

6.   Severability of Plan Provisions upon Confirmation ...................................................48

7.   Governing Law ...........................................................................................................49

8.   Time ...........................................................................................................................49

9.   Additional Documents .................................................................................................49

10. Immediate Binding Effect............................................................................................49

11. Successor and Assigns .................................................................................................49

12. Entire Agreement .........................................................................................................49

13. Notices ........................................................................................................................50

**VII.   CERTAIN RISK FACTORS AFFECTING THE DEBTORS** .....................................50

A.  Certain Bankruptcy Law Considerations ...........................................................................51

B.  Additional Factors to be Considered...................................................................................52

**VIII. VOTING PROCEDURES AND REQUIREMENTS**.......................................................54

A.  Voting Instructions and Voting...........................................................................................54

B.  Parties Entitled to Vote .......................................................................................................56

C.  Agreements Upon Furnishing Ballots..................................................................................56

D.  Change of Vote ....................................................................................................................57

E.  Waivers of Defects, Irregularities, Etc................................................................................57

F.  Miscellaneous ......................................................................................................................57

G.  Further Information, Additional Copies ..............................................................................58

**IX.   CONFIRMATION OF THE PLAN** ...............................................................................58

A.  Confirmation Hearing ..........................................................................................................58

B.  Objections ............................................................................................................................58

C.  Requirements for Confirmation of Plan...............................................................................59

1.   Requirements of Section 1129(a) of the Bankruptcy Code ......................................59

D.  Application to the Plan.........................................................................................................62

E.  Alternatives to the Plan .......................................................................................................62

**X.    CONCLUSION AND RECOMMENDATION OF THE DEBTORS** ..........................63

# I.    INTRODUCTION

## A.    General

On July 8, 2025, Mosaic Companies, LLC ("Mosaic"), Surfaces Southeast Holdco, LLC ("Holdco"), Mosaic Midco, LLC ("Midco"), Retile, LLC ("Retile"), Wallec Enterprises, LLC ("Wallec"), CAYP, LLC ("CAYP"), Surfaces Southeast, LLC ("Surfaces Southeast"), Walker & Zanger, LLC ("Walker Zanger"), WZCA Holdings, LLC ("WZCA"), and Mustang Stone Quarries, LLC ("Mustang" and collectively, the "Debtors" and/or the "Company") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

The Debtors jointly submit this Disclosure Statement for Joint Chapter 11 Plan of Liquidation (the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of acceptances or rejections of the Joint Chapter 11 Plan of Liquidation, filed concurrently herewith (as may be amended, supplemented, or modified, the "Plan") from certain holders of Claims against the Debtors.  A copy of the Plan is annexed hereto as Exhibit A.

All capitalized terms used in this Disclosure Statement that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

The Debtors urge all parties in interest to read this Disclosure Statement and the Plan carefully.  This Disclosure Statement does not include a description of each and every term of the Plan.  Accordingly, the description of the Plan set forth herein is qualified by the entirety of the Plan, which is incorporated by reference into this Disclosure Statement.

The overall purpose of the Plan is to provide for the liquidation of the Debtors in a manner designed to maximize recovery to stakeholders.

Generally, the Plan provides the following:[2]

1.  Payment in full of all Allowed Administrative Expense Claims, Fee Claims, U.S. Trustee Fees, Restructuring Expenses, Secured Claims, Priority Tax Claims and Other Priority Claims;

2.  Funding of a Liquidating Trust to govern the liquidation of the Debtors' estates and remaining assets following the Effective Date;

3.  Payment of the Prepetition Term Loan Secured Parties on the Effective Date of 100% of Cash of the Debtors as of the Effective Date, other than Cash required on the

---

[2]    The summary of the Plan contained herein is qualified in its entirety by the terms the Plan, and in the event of any inconsistency, the Plan shall control in all respects. Undefined terms used in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

Effective Date the fund the Trust Administration Reserve, the Professional Fees Account, U.S. Trustee Fees, and Restructuring Expenses;

4. Distribution to the Prepetition Term Loan Secured Parties of 100% of Class A Liquidating Trust Interests, which shall entitle the holders of Allowed Prepetition Term Loan Secured Claims to all Distributable Proceeds of the Liquidating Trust other than those reserved for holders of General Unsecured Claims;

5. Distribution to holders of General Unsecured Claims of 100% of Class B Liquidating Trust Interests, which shall entitle the holders of General Unsecured Claims to a Pro Rata Share of Distributable Proceeds on account of Avoidance Actions;

6. No recovery to the holders of Subordinated Claims, Interests, Intercompany Claims or Intercompany Interests on account of their respective Claims and Interests; and

7. Distributions under the Plan shall be funded from all remaining assets of each of the Debtors that have not been sold or abandoned prior to the Effective Date, all assets recovered by the Liquidating Trustee on behalf of the Liquidating Trust on or after the Effective Date, including proceeds of Causes of Action and Avoidance Actions, except those expressly waived and/or released pursuant to the Plan or sold in connection with any Asset Sale, and any proceeds resulting from the Liquidating Trustee's investment of the Liquidating Trust Assets on or after the Effective Date.

**B.** **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are copies of:

1. The Plan;

2. A notice (the "<u>Confirmation Hearing Notice</u>"), including, among other things: (a) notice of the filing of the Disclosure Statement and Plan; (b) the deadline for the submission of Ballots to vote to accept or reject the Plan (the "<u>Voting Deadline</u>"); (c) the deadline for objecting to confirmation of the Plan; (d) information on how to object to confirmation of the Plan; (e) the time, date, and place of the Confirmation Hearing; and (f) information on the release, exculpation and injunction provisions included in the Plan;

3. The *Order (I) Approving the Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Hearing and Establishing Notice and Objection Procedures in Respect of Confirmation of the Plan; and (VI) Granting Related Relief* [D.I. ●] (the "<u>Solicitation Procedures Order</u>"); and

4. A Ballot, with a preaddressed, postage-prepaid return envelope and instructions for completing the Ballot either by mail or by e-Ballot, for creditors within voting classes who are entitled to vote to accept or reject the Plan.

2

## II.    FREQUENTLY ASKED QUESTIONS

### A.    What is Chapter 11?

Chapter 11 is a chapter of the Bankruptcy Code permitting bankrupt companies a period in which to organize their affairs and to review their assets and obligations in order to reorganize or liquidate their businesses.

The commencement of the Debtors' Chapter 11 Cases triggered the application of the "automatic stay" under section 362 of the Bankruptcy Code.  The automatic stay halts, with certain exceptions, nearly all attempts to collect prepetition claims from debtors or to otherwise interfere with or control the Debtors' property.

### B.    What is a Plan?

A primary purpose of a chapter 11 case is to permit the formulation of a plan of reorganization or liquidation.  A plan of reorganization provides for the emergence of the debtor as a reorganized, functional business entity that is solvent.  To that end, a plan may provide for distribution of an estate's assets to creditors, and sometimes, to equity holders in order to satisfy the reorganized debtor's prepetition obligations.  The Plan proposed by the Debtors is a plan of liquidation that provides for the Debtors' orderly liquidation which has or will be accomplished principally through the sale of the Debtors' assets, the liquidation to cash of remaining assets such as Causes of Action and insurance rights and proceeds, the winding down of the Debtors' Estates, and the distribution of cash to the Debtors' creditors as set forth in the Plan and described below.

### C.    What is a Disclosure Statement?

After a plan has been proposed, the holders of claims against, or equity interests in, the debtors that are impaired by and entitled to receive distributions under the plan are entitled to vote on whether to accept or reject the plan.  Section 1125 of the Bankruptcy Code requires disclosure of "adequate information" to all such voting creditors and equity holders by way of a court-approved "disclosure statement" before the debtors may solicit any votes on a plan.  Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."  Following a hearing held on [●], 2025, the Bankruptcy Court entered an order finding that this Disclosure Statement contains "adequate information" in accordance with section 1125 of the Bankruptcy Code.

3

### D.     How does a Creditor Vote?

> THIS DISCUSSION OF THE SOLICITATION AND VOTING
> PROCESS IS ONLY A SUMMARY.  PLEASE REFER TO THE
> SOLICITATION PROCEDURES ORDER FOR A MORE
> COMPREHENSIVE DESCRIPTION OF THE SOLICITATION
> AND VOTING PROCESS.

To vote on the Plan, a holder of an Allowed Claim in a Class that is entitled to vote on the Plan must complete the Ballot (enclosed with this Disclosure Statement) and comply with the voting instructions outlined in Article VIII of this Disclosure Statement.

Pursuant to the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" under the Plan may vote to accept or reject the Plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. Holders of claims or interests that are not impaired are presumed to accept the plan.  Holders of claims or interests in an impaired class that will not receive or retain any property under a plan on account of such claims or interests are deemed to have rejected the plan.  The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan.

This Disclosure Statement, along with a Ballot used for voting on the Plan, is being distributed to the holders of Claims that are entitled to vote to accept or reject the Plan.  For a summary of the treatment of each Class of Claims and Interests, see Article III of this Disclosure Statement.

Under the Plan, only Claims in Class 2 (Prepetition Term Loan Secured Claims) and Class 3 (General Unsecured Claims) are impaired and entitled to vote to accept or reject the Plan. Holders of Claims in Class 4 (Subordinated Claims), Class 6A (Intercompany Claims), and Class 6B (Intercompany Interest), and Holders of Interests in Class 5 (Interests) will receive no distribution and, accordingly, the holders of Claims and Interests in such Classes are deemed to reject the Plan.  Therefore, their votes are not being solicited.  Claims in Class 1 (Other Priority Claims) are Unimpaired, and, therefore, the Holders of those Claims are presumed to have accepted the Plan.  Therefore, their votes also are not being solicited.

Accordingly, ballots to accept or reject the Plan are being provided only to holders of Claims in Class 2 and Class 3, and only such holders who held their Claims on the Voting Record Date are entitled to vote to accept or reject the Plan.

The Bankruptcy Court has fixed [●], 2025 as the "Voting Record Date."

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may temporarily allow a Claim for voting or other purposes.  Pursuant to the Solicitation Procedures Order, voting tabulation procedures have been established, which include certain vote tabulation rules, that provide for temporary allowance or disallowance of certain

Claims for voting purposes only.  These voting procedures, including the tabulation rules, are described in the solicitation materials provided with your Ballot.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from holders of Claims within Class 2 and Class 3 who are entitled to a vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballot sent to you with this Disclosure Statement.  To be counted, please complete and sign your Ballot, and submit it to the Voting Agent (defined below) so as to be received by the Voting Deadline of 4:00 p.m. (Prevailing Eastern Time), on [●], 2025 using one of the following methods:

> For holders of Claims in Class 2 (Prepetition Term Loan Secured Claims) and Class 3 (General Unsecured Claims), if by First Class Mail, Overnight Courier or Hand Delivery:
>
> > Mosaic Companies, LLC Ballot Processing Center
> > c/o Epiq Corporate Restructuring, LLC
> > 777 Third Avenue, 12th Floor
> > New York, New York 10017
>
> > If you would like to coordinate hand delivery of your Ballot, please email MosaicCompanies@epiqglobal.com with a reference to "Mosaic Solicitation" in the subject line, and at least twenty-four (24) hours in advance and provide the anticipated date and time of your delivery.
>
> If by Electronic, Online Submission:
>
> > Visit the Debtors' restructuring website at: https://dm.epiq11.com/case/MosaicCompanies, click on the "E-Ballot" button below the "Case Actions" section on the of the landing page, and follow the directions to submit your Ballot online.
>
> > Online "E-Balloting" is the sole manner in which Ballots will be accepted via electronic or online transmission for holders of Claims within Class 2 and Class 3. Ballots submitted by holders of Claims within Class 2 and Class 3 via facsimile or email will not be counted.

ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, AND EXCEPT AS EXPRESSLY PROVIDED ABOVE, NO BALLOTS RECEIVED BY TELECOPY, FACSIMILE, EMAIL, OR OTHER ELECTRONIC MEANS WILL BE ACCEPTED.  Following the Voting Deadline, the Claims Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan. Ballots submitted to the Debtors or any of its agents and advisors (other than the Voting Agent) will not be counted.

If you have any questions regarding the Ballot, did not receive a return envelope with your Ballot, did not receive an electronic copy of the Disclosure Statement and the Plan, or need physical copies of the Ballot or other enclosed materials, please contact the Debtors' solicitation

and claims agent, ("Epiq") or the "Voting Agent"), in writing at Mosaic Companies, LLC Ballot Processing Center, c/o Epiq Corporate Restructuring, LLC, 777 Third Avenue, New York, NY 10017, or by email at MosaicCompanies@epiqglobal.com with a reference to "Mosaic Solicitation" in the subject line, or by calling (888) 863-4070 (U.S. and Canada) or 1 (503) 782-9294 (International) and request to speak with a member of the solicitation team.

**E.      Confirmation Hearing**

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for [●], 2025 at [●]:00 [●].m. (ET), before the Honorable Craig T. Goldblatt at the United States Bankruptcy Court, 824 Market Street, 3rd Floor, Courtroom #7, Wilmington, Delaware 19801 (the "Confirmation Hearing").   The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be filed and served on or before [●], 2025, at 4:00 p.m. (ET), in the manner described in the Confirmation Hearing Notice accompanying this Disclosure Statement. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned.

**F.      Recommendation of the Debtors**

**The Debtors believe that the Plan provides the greatest possible recovery to creditors.**

**The Debtors urge all creditors entitled to vote, to vote in favor of the Plan.**

### III.      OVERVIEW OF THE PLAN

The following is a brief summary of the treatment of Claims and Interests under the Plan. Creditors and other parties in interest are urged to review the more detailed description of the Plan contained in this Disclosure Statement and the Plan itself, which is annexed as Exhibit A to this Disclosure Statement.

Set forth below is a table summarizing the classification and treatment of Claims and Interests under the Plan and the estimated distributions to be received by the Holders of such Claims and Interests thereunder.  The actual distributions may differ from the estimates set forth in the table depending on, among other things, variations in the amounts of Allowed Claims, and the existence of Disputed Claims.

SUMMARY OF ESTIMATED DISTRIBUTIONS UNDER THE PLAN

| Class | Estimated Allowed Amounts | Treatment under the Plan | Estimated Recovery | Impaired (entitled to vote) |
|---|---|---|---|---|
| Class 1: Other Priority Claims | [●] | Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction | 100% | No (presumed to accept) |

| Class | Estimated Allowed Amounts | Treatment under the Plan | Estimated Recovery | Impaired (entitled to vote) |
|---|---|---|---|---|
| | | of such Claim, Cash in an amount equal to such Claim, payable on the later of (i) forty-five (45) calendar days after the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the first Business Day after thirty (30) days from the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter. | | |
| Class 2: Prepetition Term Loan Secured Claims | [$51.1 million[3]] | Except to the extent that a holder of an Allowed Prepetition Term Loan Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive (i) 100% of all Cash of the Debtors as of the Effective Date, other than Cash required on the Effective Date to fund the Trust Administrative Reserve, the Professional Fees Account, U.S. Trustee Fees, and Restructuring Expenses, (ii) 100% of Class A Liquidating Trust Interests, which shall entitle the holders of Allowed Prepetition Term Loan Secured Claims to all distributable proceeds of the Liquidating Trust other than the proceeds of Avoidance Actions (including, for the avoidance of doubt, any proceeds of any Asset Sales, any residual cash in the Trust Administrative Reserve after administration of the Liquidating Trust and residual cash in the Professional Fees Account after satisfaction of Allowed Professional Fees), and (iii) payment in full of all Restructuring Expenses incurred by | [●]% | Yes (entitled to vote) |

---

[3]    [NTD: to include interest through Petition Date.]

| Class | Estimated Allowed Amounts | Treatment under the Plan | Estimated Recovery | Impaired (entitled to vote) |
|---|---|---|---|---|
| | | or on behalf of the Prepetition Term Loan Secured Parties. The foregoing treatment, together with the receipt of distributions on account of the Prepetition Term Loan Unsecured Claim, shall be in final satisfaction of the Prepetition Term Loan Claims. | | |
| Class 3: General Unsecured Claims | [●] | Each holder of an Allowed General Unsecured Claim shall receive in full satisfaction, settlement, and release of, and in exchange for such Allowed General Unsecured Claim, 100% of Class B Liquidating Trust Interests. | [●]% | Yes (entitled to vote) |
| Class 4: Subordinated Claims | [●] | Subordinated Claims will be extinguished, cancelled, and released on the Effective Date. Holders of Subordinated Claims shall not receive or retain any distribution under the Plan on account of such Subordinated Claims. | [●]% | Yes (deemed to reject) |
| Class 5: Interests | [●] | Interests shall be extinguished, cancelled, and released on the Effective Date. Holders of Interests shall not receive or retain any distribution under the Plan on account of such Interests. | 0% | Yes (deemed to reject) |
| Class 6A: Intercompany Claims | [●] | On or after the Effective Date, all Allowed Intercompany Claims and Intercompany Interests shall be adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or the Liquidating Trustee (as applicable). | 0% | Yes (deemed to reject) |
| Class 6B: Intercompany Interests | [●] | On or after the Effective Date, all Allowed Intercompany Claims and Intercompany Interests shall be adjusted, continued, settled, reinstated, discharged, or | 0% | Yes (deemed to reject) |

| Class | Estimated Allowed Amounts | Treatment under the Plan | Estimated Recovery | Impaired (entitled to vote) |
|---|---|---|---|---|
| | | eliminated, in each case to the extent determined to be appropriate by the Debtors or the Liquidating Trustee (as applicable). | | |

The treatment and distribution provided to holders of Allowed Claims and Interests pursuant to the Plan are in full and complete satisfaction of the Allowed Claims and Interests, as the case may be.

The Plan contemplates certain releases by the Debtors, which includes the release of the Debtors, the Debtors' current directors, officers, and management, the Wind-Down Estates. Consistent with the Debtors' fiduciary duties, the Debtors and their advisors have evaluated the propriety of the releases under the Plan, including the Debtors' release of current directors and officers. After conducting this review, the Debtors have determined such releases are proper and justified.

## IV.    BACKGROUND OF THE DEBTORS AND CERTAIN EVENTS PRECEDING THE FILING OF THEIR CHAPTER 11 CASES

### A.    General Background and History

Mosaic is a nationally recognized leader in the surfaces industry, offering a broad range of products including luxury wall and mosaic tile, floor tile, and slab to retail and wholesale customers. The Mosaic company group operates primarily through two subsidiaries—Walker Zanger and Surfaces—with management and shared services provided by Mosaic.

Founded in 1952, Walker Zanger is a leading stone and tile design resource in North America. As of the Petition Date, Walker Zanger operated 11 showrooms and stone slab galleries across the United States, with locations in California, Texas, North Carolina, and New York. Walker Zanger also worked with hundreds of authorized dealers across the country to serve major metropolitan areas in the United States, as well as dealers in Canada and Japan. For over 70 years, the company had helped design-trade professionals and homeowners realize their boldest design visions with the most unique, original and thought-provoking surface materials. Walker Zanger is a go-to expert in the industry, and is often the first to discover new materials, styles, innovations and specialty surface products. Walker Zanger also distributes its products to other bath and kitchen design showrooms under the Walker Zanger and Anthology brand names.

Founded in 1990, Surfaces has been at the forefront of the decorative surfaces industry for more than three decades. A preeminent designer and value-added distributor of mosaic and specialty wall tiles, Surfaces had set the trends in the category through consistent product development, innovation and design excellence. Leveraging a global resource team, Surfaces provided customers differentiated products that make spaces beautiful. With production, distribution, design and support capabilities, Surfaces delivered an industry-leading customer and

partner experience.  Surfaces serviced commercial customers such as Floor & Decor and Lowe's Home Improvement.

Mosaic served as the integrated back-office for Walker Zanger and Surfaces, including employing the senior management and most of the back-office employees and carrying out centralized cash management for the businesses and their affiliated companies.  The remaining Debtors were holding companies or nonoperating entities with no material assets or creditors (apart from guarantees on funded indebtedness).

Until April 2025, the Mosaic also indirectly owned Opustone LLC ("Opustone"), an importer and distributor of natural and engineered stone and tile through three Florida-based showrooms, carrying over 10,000 products carefully curated from over 25 countries worldwide.  On April 8, 2025, Opustone was sold in a stock sale to an affiliate of The Home Depot (the "Opustone Sale") for approximately $100 million.  The proceeds of the Opustone sale were used in part to paydown $25 million of the Prepetition ABL Facility and $50.6 million of the Prepetition Term Loan Facility, and also to establish an approximately $10 million reserve (the "Opustone Reserve") to be used in connection with certain post-closing obligations, transition services, and potential wind-down obligations, including certain employee- and tax-related obligations.

The Debtors also own two foreign, non-debtor affiliates: Ceramica Antique S De RL de CV ("Ceramica") and Surfaces Europe SL ("Surfaces Europe").  Ceramica previously operated a manufacturing facility in Dolores Hidalgo, Mexico, that produced handcrafted ceramic tiles.  Ceramica historically operated at a loss and shutdown operations in April of this year.  [The Debtors have sought a buyer for Ceramica or its assets and business and remain hopeful that a transaction can be consummated, but the Debtors do not believe that the transaction is likely to yield any material value to their estates.]  If a transaction cannot be completed, then Ceramica will be wound down in Mexico.  Surfaces Europe is a European purchasing arm for the Surfaces Southeast business that has *de minimis* assets and affairs.

Mosaic was formed in 2019 as a partnership between Albert Claramonte, an entrepreneur who founded Surfaces Southeast, LLC, and pioneered the U.S. glass mosaic tile market, and The Baupost Group, L.L.C., a leading Boston-based investment firm with significant experience partnering with family- and founder-owned businesses, with the goal of building a leading omnichannel platform in specialty wall, mosaic, and slab.  With that business strategy in mind, Mosaic immediately sought opportunities to acquire compelling businesses in the industry and, to that end, on January 1, 2021, Mosaic purchased Walker Zanger.  At the time, Walker Zanger was operating at a loss, but Mosaic saw the value of the Walker Zanger brand and believed that it could restructure the business in a way that would lead to profitability.

As Mosaic continued exploring other potential strategic acquisitions to complement and strengthen the Mosaic brand portfolio, it identified Opustone, a leader in the Florida market for natural and engineered stone slab and tile, as a compelling candidate.  Opustone had a best-in-class operation in Florida that Mosaic believed would provide much-needed expertise and resources to Walker Zanger.  Moreover, Mosaic believed that combining Walker Zanger's renowned reputation and products with Opustone's showroom model, leadership, and supplier base would enhance the ability to complete a quicker and more robust turnaround for Walker Zanger.

To finance its acquisition of Opustone, Mosaic entered into a $117 million Prepetition Term Loan Facility. Certain of the proceeds of the Prepetition Term Loan Facility were used to finance the approximately $53 million aggregate purchase price of Opustone, while the remainder were used for various purposes, including a paydown of the company's then-existing revolving credit facility, to cover related third-party expenses, to return capital to the then-members of Mosaic, and for working capital. Mosaic completed its acquisition of Opustone on July 2, 2021.

## B.    Events Leading to the Chapter 11 Cases

### 1.    Macroeconomics and Inventory

Following the Walker Zanger and Opustone acquisitions, Mosaic continued to focus on the strategic restructuring of Walker & Zanger, as well as realizing synergies and maximizing the businesses of the broader Mosaic enterprise. To support these efforts, in 2022 and 2023, certain funds managed by The Baupost Group, L.L.C., invested an additional approximately $42 million in equity capital into the enterprise, with the goal and expectation that the integration of the three businesses would increase efficiencies, reduce costs, expand the company's nationwide footprint, and realize increased profitability.

However, macroeconomic conditions in 2021, 2022, and 2023 created challenges in the Debtors' supply chain, which led to a cascade of financial difficulties. Mosaic's business is capital-intensive, and most products are sourced from overseas. Coming out of the height of the COVID-19 pandemic, receiving inventory into U.S. ports was hindered by federal restrictions, as well as delays caused by suspended port activity and delivery logjams. As a result of these issue and delays, the Company's suppliers were unable to fill, or the Company was unable to receive in a timely manner, the product mix and quantities for orders they placed—in many instances receiving only a fraction of the product they ordered. In response, the Company increased product orders to account for these anticipated product shortfalls relative to ordered amounts. But when the COVID-19 restrictions were reversed and supply chains normalized, deliveries returned to higher levels—beyond what the Company needed to satisfy its customer demands. This caused inflated expense with no corresponding revenue generation.

In addition to the delivery delays followed by unexpected delivery increases, the global supply chain disruptions, port congestion, and other geo-political events at the time led the cost of container freight to increase to record highs. Ordinarily, freight costs can be passed through to consumers, at least in part, but Lowe's Home Improvement, the Company's largest customer at the time, refused to share the freight cost burden, which resulted in significantly decreased margins for the Company.

At the same time, interest rates skyrocketed after 2021, following compression during the COVID-19 pandemic. Between 2022 and 2024, the Secured Overnight Financing Rate—the primary influence on corporate and commercial interest rates—rose from under 1 percent to nearly 6 percent in less than one year. Increased interest rates caused the market for new home mortgages, mortgage refinancings, and home equity lines of credit to plummet, which in turn reduced the market for luxury home finishings and materials like those that the Company supplies.

Additionally, rising interest rates increased the Debtors' cost of funds under the Prepetition ABL Facility and Prepetition Term Loan Facility.

These combined market pressures resulted in Mosaic ordering, paying for, and warehousing more inventory than it could sell, paying higher freight and storage costs, incurring higher interest rates on its lines of credit, and experiencing reduced consumer demand.  In total, Mosaic experienced an unforeseen perfect storm of economic misfortune at a time when it had expected to be able to optimize its businesses and turn around Walker Zanger.

### 2. Stone Countertop Litigation

Walker Zanger has been named as one of dozens of defendants in approximately 150 lawsuits by plaintiff fabricators alleging that they were exposed during fabrication to hazardous products manufactured, distributed, or supplied by Walker Zanger and other named defendants, including silica, metals, toxins, volatile organic compounds, and other substances.  Plaintiff fabricators allege injuries from such exposure, including lung diseases, silicosis, and other diseases (the foregoing lawsuits, collectively, the "Stone Countertop Litigation").  Walker Zanger disputes liability and has not been found liable in any of the Stone Countertop Litigation.  Walker Zanger is being defended by its liability insurers, and its out-of-pocket costs to date have been limited to insurance coverage and monitoring counsel.

### 3. ABL Cash Dominion

Since March 2025, the Prepetition ABL Facility has been in cash dominion, such that the Company's cash receipts are swept daily to Truist and applied to the balance of the facility.  As a result, the Company then reborrows funds under the Prepetition ABL Facility on an as-needed basis, subject to certain maximum cash-on-hand limitations and a collateral borrowing base.

### C.    The Debtors' Prepetition Corporate Structure

The following chart depicts the relationship among the Debtors (highlighted in blue) and their non-Debtor affiliates:



## D.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors' capital structure consists of outstanding secured funded-debt obligations in the aggregate amount of approximately $65 million, including under the Prepetition ABL Facility and Prepetition Term Loan Facility. The Debtors' funded-debt and other obligations are summarized below.

### 1.    Prepetition ABL Facility

On September 27, 2021, Mosaic, as lead borrower, together with certain of its subsidiaries, from time to time, as additional borrowers and/or guarantors, entered into that certain Second Amended and Restated ABL Credit Agreement (as amended, restated, modified, or supplemented from time to time, the "ABL Credit Agreement") with: (a) the financial institutions as lenders thereto from time to time (the "Prepetition ABL Secured Parties"); and (b) Truist Bank ("Truist") as Administrative Agent, Collateral Agent, and an L/C Issuer (the "Prepetition ABL Facility"), which had an initial revolving commitment of $40,000,000. The availability under the Prepetition ABL Facility has stepped down over time through various amendments and forbearances. The Prepetition ABL Facility is secured by a valid and fully perfected security interest on substantially all the Debtors' assets. The maturity date of the Prepetition ABL Facility is June 30, 2026. As of the Petition Date, the outstanding amount of the Prepetition ABL Facility is approximately $14,000,000, with approximately $650,000 committed to outstanding letters of credit.

### 2. Prepetition Term Loan Facility

On July 2, 2021, Mosaic, as borrower, and its subsidiary guarantors entered that certain Credit Agreement (as amended, restated, modified, or supplemented from time to time, the "Prepetition Term Loan Credit Agreement") for a term loan facility (the "Prepetition Term Loan Facility") with Oaktree Fund Administration, LLC ("Oaktree"), as Administrative Agent and Collateral Agent (the "Prepetition Term Loan Agent") and the other lenders named therein (the with the Prepetition Term Loan Agent, the "Prepetition Term Loan Secured Parties"). The Prepetition Term Loan Facility provides for an initial aggregate principal amount of $117,000,000. The Prepetition Term Loan Facility is secured by a valid and fully perfected security interest on substantially all the Debtors' assets. The maturity date of the Prepetition Term Loan Facility is July 2, 2026. As of the Petition Date, the outstanding principal amount of the Prepetition Term Loan Facility is approximately $51 million.

### 3. Intercreditor Agreement

On July 2, 2021, Truist and Oaktree entered into that certain Intercreditor Agreement (as amended, restated, modified, or supplemented from time to time, the "Intercreditor Agreement"). The Intercreditor Agreement establishes the relative priority of the security interests of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties, and the respective rights and remedies in respect of collateral, among other things. In general, "ABL Priority Collateral," as defined in the Intercreditor Agreement, includes the Debtors' working capital assets, including accounts, inventory, deposit accounts, and the like, while "Term Loan Priority Collateral" comprises the remainder of the Debtors' assets.

### 4. Trade Obligations

As of the Petition Date, the Debtors estimated that they had approximately $5 million in unpaid trade payables.

## V.    EVENTS DURING THE CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

The Debtors filed their voluntary chapter 11 petitions on July 8, 2025. The Chapter 11 Cases were assigned to Bankruptcy Judge Craig T. Goldblatt. The Debtors have continued in the management and possession of their business and properties as debtors in possession since the Petition Date. Set forth below is a summary of material events that have occurred since the Petition Date.

### B.    First-Day Relief

Upon the commencement of the Chapter 11 Cases, the Debtors filed several motions seeking typical "first-day" relief in their Chapter 11 Cases (collectively, the "First Day Motions"), as well as the declaration of Randall Jackson, the Group President and Chief Executive Officer of Mosaic Companies, LLC, in support thereof [D.I. 4], in order to ensure a smooth transition into chapter 11 and to allow the Debtors to continue to operate their business and administer their

estates.  The Debtors obtained the following orders approving the First Day Motions and granting various forms of relief that the Debtors deemed essential to facilitating their transition into chapter 11:

- *Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases* [D.I. 50];

- *Interim Order (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Approving Proposed Adequate Assurance of Payment to Utility Providers and Authorizing Debtors to Provide Additional Assurance, (III) Establishing Procedures to Resolve Requests for Additional Assurance and (IV) Granting Related Relief* [D.I. 51];

- *Interim Order (I) Authorizing Debtors to (A) Continue their Existing Cash Management System, (B) Honor Certain Prepetition and Postpetition Obligations Related Thereto, (C) Maintain their Bank Accounts And Existing Business Forms, (D) Implement Changes to the Existing Cash Management System as Necessary, and (E) Continue Ordinary Course Intercompany Transactions; (II) Provide Relief from the Requirements of 11 U.S.C. § 345(b) and the U.S. Trustee's Operating Guidelines; and (III) Granting Related Relief* [D.I. 52];

- *Interim Order (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Maintain Employee Benefits Programs, and (II) Granting Related Relief* [D.I. 53];

- *Interim Order (I) Authorizing Debtors to (A) Continue Insurance Policies and Agreements Relating Thereto in the Ordinary Course of Business, Including Premium Finance Agreements, (B) Honor Certain Prepetition Obligations in Respect Thereof, and (C) Renew, Revise, Extend, Supplement, Change or Enter into New Insurance Coverage and Premium Finance Agreements as Needed in Their Business Judgment, and (II) Granting Related Relief* [D.I. 54];

- *Interim Order Authorizing (I) The Debtors to Pay Certain Prepetition Taxes and Fees, (II) Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief* [D.I. 55];

- *Interim Order (I) Authorizing Payment of Prepetition Claims of Certain Critical Vendors and (II) Granting Related Relief* [D.I. 56];

- *Interim Order (I) Authorizing the Payment of Certain Claims of Possessory Claimants, and (II) Granting Related Relief* [D.I. 57];

- *Interim Order (I) Authorizing the Debtors to Honor and Continue Customer Programs and Customer Obligations in the Ordinary Course of Business, and (II) Granting Related Relief* [D.I. 58];

15

- *Interim Order (I) Authorizing Debtors to Continue Factoring Certain Receivables under Various Factoring Agreements Consistent with Prepetition Practices, and (II) Granting Related Relief* [D.I. 59];

- *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503, 506, 507, and 552 (I) Authorizing the Debtors to Obtain Postpetition Secured Superpriority Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [D.I. 60];

- *Order (I) Approving the Retention of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective as of the Petition Date, and (II) Granting Related Relief* [D.I. 61];

- *Order (I) Authorizing Debtors to Seal Certain Personally Identifiable Information of Customers, Creditors, and Parties in Interest and (II) Granting Related Relief* [D.I. 62];

- *Final Order Authorizing (I) the Debtors to Pay Certain Prepetition Taxes and Fees, (II) Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief* [D.I. 125];

- *Final Order (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Approving Proposed Adequate Assurance of Payment to Utility Providers and Authorizing Debtors to Provide Additional Assurance, (III) Establishing Procedures to Resolve Requests for Additional Assurance and (IV) Granting Related Relief* [D.I. 124];

- *Final Order (I) Authorizing Debtors to (A) Continue Insurance Policies and Agreements Relating Thereto in the Ordinary Course of Business, Including Premium Finance Agreements, (B) Honor Certain Prepetition Obligations in Respect Thereof, and (C) Renew, Revise, Extend, Supplement, Change or Enter into New Insurance Coverage and Premium Finance Agreements as Needed in Their Business Judgment, and (II) Granting Related Relief* [D.I. 133];

- *Final Order (I) Authorizing Debtors to (A) Continue their Existing Cash Management System, (B) Honor Certain Prepetition and Postpetition Obligations Related Thereto, (C) Maintain their Bank Accounts And Existing Business Forms, (D) Implement Changes to the Existing Cash Management System as Necessary, and (E) Continue Ordinary Course Intercompany Transactions; (II) Provide Relief from the Requirements of 11 U.S.C. § 345(b) and the U.S. Trustee's Operating Guidelines; and (III) Granting Related Relief* [D.I. 172];

- *Final Order (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee*

16

*Expenses and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief* [D.I. 126];

- *Final Order (I) Authorizing the Payment of Certain Claims of Possessory Claimants, and (II) Granting Related Relief* [D.I. 169];

- *Final Order (I) Authorizing Debtors to Honor and Continue Customer Programs and Customer Obligations in the Ordinary Course of Business and (II) Granting Related Relief* [D.I. 173];

- *Final Order (I) Authorizing Debtors to Continue Factoring Certain Receivables Under Various Factoring Agreements Consistent with Prepetition Practices, and (II) Granting Related Relief* [D.I. ●]; and

- *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503, 506, 507, and 552 (I) Authorizing the Debtors to Obtain Postpetition Secured Superpriority Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [D.I. 170].

## C.    [Rejection of Executory Contracts and Unexpired Leases and Abandonment of Burdensome Assets

On [●], 2025, the Debtors filed a motion [D.I. ●] to reject certain unexpired leases of nonresidential real property that the Debtors determined they no longer required.  Further, by the motion, the Debtors requested authority to abandon any personal property remaining at the leased premises. On [●], 2025, the Court entered an order [D.I. ●] approving the motion.

As further discussed herein, to the extent not assumed and assigned by separate order of the Court, the Plan provides for the rejection of any remaining unexpired nonresidential leases and executory contracts pursuant to section 365 of the Bankruptcy Code in accordance with the terms of the Plan.]

## D.    Schedules of Assets and Liabilities and Statements of Financial Affairs, and Establishment of Bar Dates

On July 22, 2025, the Debtors filed a motion (the "Bar Date Motion") [D.I. 85] seeking entry of an order establishing certain bar dates (together, the "Bar Dates") for filing proofs of claim against the Debtors. On [●], 2025, the Bankruptcy Court entered an order approving the Bar Date Motion (the "Bar Date Order") [D.I. ●], which established (i) [●], 2025, 5:00 p.m. (prevailing Eastern Time) as the last date by which creditors asserting certain prepetition claims (including claims based on section 503(b)(9) of the Bankruptcy Code) were required to file proofs of claim, with certain exceptions (the "General Bar Date"); (ii) [●], 2026 as the bar date for governmental units (the "Governmental Bar Date"); (iii) the later of (x) the General Bar Date or Governmental Bar Date, as applicable, and (y) 5:00 p.m. (Prevailing Eastern Time) on the date that is 30 days following service of an order approving rejection of an executory contract or unexpired lease of the Debtors as the deadline for an entity asserting a claim for damages against any of the Debtors

arising from such rejection to file a proof of claim on account of such damages; and (iv) the later of (x) the General Bar Date or Governmental Bar Date, as applicable, and (y) 5:00 p.m. (Prevailing Eastern Time) on the date that is 30 days following service of notice of an amendment to the Debtors' Schedules as the deadline for an entity whose claim is affected by such amendment to file, amend, or supplement a proof of claim with respect to such claim, provided that any amendment to the Schedules to include the intercompany amount owed among the Debtor entities shall not extend the General Bar Date.  In accordance with the Bar Date Order, on [●], 2025, the Debtors filed and served a notice of the Bar Dates and accompanying materials on known creditors [D.I. ●].  The Debtors also published notice of the Bar Dates in the national editions of [*USA Today*, *LA Times*, and the *Miami Herald*] on [●], 2025 [D.I. ●].  [The Bar Date Order does not require claimants asserting claims related to the Stone Countertop Litigation to file claims by the Bar Date.]

On August 4, 2025, the Debtors filed their Schedules of Assets and Liabilities (the "<u>Schedules</u>"), with (i) Mosaic [D.I. 138], (ii) Holdco [D.I. 148], (iii) Midco [D.I. 143], (iv) Retile [D.I. 146], (v) Wallec [D.I. 156], (vi) CAYP [D.I. 140], (vii) Surfaces [D.I. 150], (viii) Walker Zanger [D.I. 152], (ix) WZCA [D.I. 154], and (x) Mustang [D.I. 144]. Concurrently with the Schedules, the Debtors filed the Statements of Financial Affairs ("<u>Statements</u>") for Mosaic [D.I. 147], Holdco [D.I. 149], Midco [D.I. 143], Retile [D.I. 147], Wallec [D.I. 157], CAYP [D.I. 141], Surfaces [D.I. 151], Walker Zanger [D.I. 153], WZCA [D.I. 155], and Mustang [D.I. 145].

**E.      The Debtors' Postpetition Financing**

The Debtors obtained a commitment for a $15 million debtor-in-possession financing facility (the "<u>DIP Facility</u>") from Truist, pursuant to the terms of the DIP Credit Agreement, as defined and more fully described in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Superpriority Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "<u>DIP Motion</u>") [D.I. 22].  The terms of the DIP Facility included a creeping roll-up by continuing the cash dominion practices under the Prepetition ABL Loans, with cash sweeps and paydowns applied in the first instance to the Prepetition ABL Loans, freeing up dollar-for-dollar availability under the DIP Facility that the Debtors could draw to fund their chapter 11 cases.  The material economic terms of the DIP Facility essentially mirrored those of the Prepetition ABL Loans, including the aggregate availability, interest rate, and revolving commitment fee.  The DIP Facility also carried a modest upfront fee of 75bps.  The DIP Motion also provided for the continued use of the Prepetition ABL Secured Parties' and the Prepetition Term Loan Secured Parties' cash collateral.

The DIP Facility and use of cash collateral were critical components of these chapter 11 cases and necessary to fund these cases through a successful sale and thereafter.  In connection with preparation for their cases, the Debtors and their advisors evaluated the Debtors' liquidity position and developed projections (as may updated from time to time in accordance with the terms of the DIP Facility, the "<u>Approved Budget</u>") of postpetition cash needs for the Debtors' businesses in the initial 13 weeks of these chapter 11 cases (including detailed line items for categories of

cash flows anticipated to be received or disbursed during this period), as well as longer-term monthly forecasts, to determine the amount of postpetition financing required to administer these cases.  The DIP Facility was negotiated and sized based on the Approved Budget, and the Debtors believe that the DIP Facility, combined with uses of cash collateral, is adequate to fund these cases through completion of the Artivo Sale, sale or liquidation of the Debtors' remaining assets and businesses, and thereafter to confirmation of a liquidating chapter 11 plan.  The DIP Facility and use of cash collateral were the result of arm's-length, good faith negotiations with the Debtors' existing lenders.

## F.    The Debtors' Sale Process

The Debtors commenced these chapter 11 cases to pursue the going concern sale of their Walker Zanger and Anthology businesses to Artivo Surfaces, LLC ("Artivo") under the Asset Purchase Agreement by and among the Company, as sellers, and WZ Buyer, LLC, as buyer, and Artivo, as guarantor (the "Artivo APA"), and to sell, or execute an orderly winddown of, their remaining businesses and assets, including Surfaces' business and assets, followed by confirming a plan of liquidation.  To facilitate these goals, the Debtors filed a sale motion and the Plan.

### 1.    The Artivo Sale

The Debtors executed the Artivo APA on July 3, 2025.  As described more fully in the *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of Substantially All Debtor Walker & Zanger, LLC's Assets and Certain Assets of Debtor Surfaces Southeast, LLC, to WZ Buyer, LLC, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Debtors' Entry into the Asset Purchase Agreement with WZ Buyer, LLC, and Certain Ancillary Agreements; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to WZ Buyer, LLC; and (IV) Granting Related Relief* [D.I. 23] (the "Sale Motion") and the *Declaration of Randall Jackson in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Sale of Substantially All Debtor Walker & Zanger, LLC's Assets and Certain Assets of Debtor Surfaces Southeast, LLC, to WZ Buyer, LLC, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Debtors' Entry into the Asset Purchase Agreement with WZ Buyer, LLC, and Certain Ancillary Agreements; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to WZ Buyer, LLC; and (IV) Granting Related Relief* (the "Sale Declaration") [D.I. 37], the Debtors believed that the Artivo APA represented the highest and otherwise best consideration available for the Debtors' Walker Zanger and Anthology businesses.  The Debtors' businesses have been extensively marketed since 2022, including with the help of the Debtors' former investment banker, Harris Williams, and the Debtors did not believe that there were viable, superior alternative transactions available in the marketplace.  As a result, the Debtors sought to expeditiously consummate the Artivo sale through a private sale.  The Debtors believed that proceeding on the time frame contemplated by the Artivo APA was in the best interests of their estates for a variety of reasons, including because the Artivo APA represented the highest and otherwise best purchase consideration, the timeline provided sufficient notice and process—in excess of the requirements of the Bankruptcy Code and Bankruptcy Rules—to interested parties (including creditors and contract and lease counterparties), and the prompt closing of the sale would relieve the estate of significant ongoing administrative costs, including obligations to transferred employees, lease obligations, and other expenses.

19

### 2. Prepetition Marketing

In April 2022, the Debtors engaged Harris Williams LLC ("Harris Williams") to market the Debtors' businesses—Walker Zanger, Opustone and Surfaces—as a combined enterprise. In the second quarter of 2022, Harris Williams began pre-marketing the Debtors' business on a no-names basis with a comprehensive list of over one hundred financial, sponsor-backed strategic, and strategic buyers. By July 2022, Harris Williams's efforts resulted in a comprehensive list of potential buyers that Harris Williams could engage upon a formal launch of the marketing.

In late 2022, Harris Williams conducted introductory meetings between the Debtors' then-CEO and a group of eight financial sponsors that registered interest in learning more on a preliminary basis. Then, in February 2023, at the request of the management team and other key stakeholders, Harris Williams recommended a targeted group of buyers to approach for informed feedback on valuation and outlined a process to maximize optionality, while creating a path for interested groups to pursue an acquisition of the Debtors' businesses as a whole. By April and May 2023, Harris Williams engaged thirteen (13) potential bidders and reviewed an extensive set of marketing materials. Five (5) parties submitted initial indications of interest. Throughout May and June 2023, Harris Williams supported comprehensive diligence for all the potentially interested bidders, including facilitating a management presentation and site visits, updating and maintaining access to a data room, and conducting significant follow-up with the management team. While conducting next stage diligence with these groups, Harris Williams also engaged other inbound interest from strategic buyers that ultimately fell away. All five parties that submitted IOIs except for one ultimately withdrew their interest. The Debtors, in consultation with their advisors, determined the last remaining bid was not actionable on the terms presented.

Despite a lack of interest from potential buyers, the Debtors continued to pursue strategic options throughout the remainder of 2023 and 2024, incorporating feedback from prior marketing initiatives along the way. In August 2024, the Debtors re-engaged Harris Williams to help navigate inbound strategic interest from two groups regarding the Debtors' showroom-focused business (including, specifically, Walker Zanger). To stoke competition, Harris Williams shared informational diligence packages with four strategic buyers. Harris Williams also helped prepare an overview on the distribution-focused business, which the Debtors used to leverage discussions with potential buyers. Through these efforts, three (3) parties submitted initial indications of interest. Of the three interested bidders, two were for the combined showroom businesses (i.e., Walker Zanger and Opustone) and one—from an affiliate of The Home Depot—was for Opustone only.

In October 2024, given the higher value and certainty of the bid submitted for Opustone by The Home Depot, as well as a willingness by The Home Depot to evaluate the Walker Zanger business for potential incremental value, the Debtors entered into a period of exclusivity with The Home Depot to conduct comprehensive diligence, prepare a transition services agreement, and negotiate the acquisition terms. After concluding diligence, The Home Depot declined to bid on the Walker Zanger business and elected to proceed only with an Opustone transaction. Throughout this time and into the first quarter of 2025, Harris Williams continued to discuss a standalone opportunity for Walker Zanger with several other buyers, but those discussions did not gain traction.

On April 8, 2025, the Debtors and The Home Depot closed on the sale and purchase of Opustone—for close to double what the Debtors had paid for the business less than four years before. Indeed, the purchase price for the Opustone transaction was higher than any other bid the Debtors had received for the entire enterprise as a whole.

Thereafter, in the spring 2025, WZ Buyer, LLC (the "Buyer"), an affiliate of Artivo emerged as the sole interested party who submitted a viable bid for a going concern sale of the Walker Zanger business and the Anthology business. The Debtors' negotiations with the Buyer resulted in the parties entering into a letter of intent on May 27, 2025, and thereafter, following confirmatory diligence by the Buyer, the parties executed the Artivo APA on July 3, 2025.

Once approved, the Artivo APA will provide gross-proceeds of up to $17.5 million to the Debtors' estates for the benefit of all stakeholders. Closing the proposed transaction will substantially reduce the Debtors' operating cash burn, including as related to real property leases, employees, and vendors. Importantly, these proceeds should be sufficient to pay off the DIP Facility and Prepetition ABL Facility, thereby immediately realizing interest-expense and other savings. The Artivo APA requires that the sale close no later than August 22, 2025.

### 3. Sale Hearing and Entry of Sale Orders

[On [●], 2025 (the "Hearing"), the Court held a hearing to consider approval of the sale to Artivo. At the Hearing, the Court approved the Artivo Sale. The Artivo Sale closed on [●], 2025, resulting in the Debtors receiving net sale proceeds of $[●].]

### 4. The Debtors' Remaining Businesses

The Debtors continued exploring alternatives for their remaining assets and businesses, comprising principally of Surfaces' wholesale and distribution business. In the event the Debtors are unable to sell such businesses, the Debtors intend to liquidate the businesses.

### G.    Independent Director Investigation

A special committee of the Debtors' Boards of Managers, comprising independent director Jeffrey T. Varsalone, is completing an investigation of prior corporate transactions.

## VI.    PLAN

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under the plan and (c) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.

### A.    Overview of the Plan

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY

REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE EXHIBITS AND SCHEDULES THERETO.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE SUMMARY CONTAINED HEREIN AND THE PLAN, THE PLAN SHALL GOVERN AND CONTROL IN ALL RESPECTS.

The Plan constitutes a joint plan of liquidation for all of the Debtors.

This Section summarizes the treatment of each of the Classes of Claims and Interests under the Plan and describes other provisions of the Plan. Only holders of Allowed Claims—Claims that are not in dispute, contingent, or unliquidated in amount and are not subject to an objection or an estimation request—are entitled to receive distributions under the Plan.  For a more detailed description of the definition of "Allowed," see Article I of the Plan.  Until a Claim becomes Allowed, no distributions will be made to the holder of such Claim.  The Debtors believe that they will be able to perform their obligations under the Plan.  The Debtors also believe that the Plan permits fair and equitable recoveries.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, and release of all Claims or Interests.  The Debtors will make all payments and other distributions to be made under the Plan unless otherwise specified.

## B.    Administrative Expense and Priority Claims

### 1.    Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors or the Liquidating Trustee agree to different treatment, the Debtors or the Liquidating Trustee, as applicable, shall pay to each holder of an Allowed Administrative Expense Claim, other than Fee Claims, Cash in an amount equal to such Claim on or the first Business Day after, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the date such Administrative Expense Claim is Allowed.

Holders of Administrative Expense Claims, other than Fee Claims, that were required to file and serve a request for payment of such Administrative Expense Claims and that did not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property, or the Liquidating Trust or the Liquidating Trust Assets.  The Debtors or the Liquidating Trustee, as applicable, may file and serve objections to Administrative Expense Claims on or before the Claims Objection Deadline.

### 2.    Fee Claims

a)    **Professional Fees Account**.  On the Effective Date, the Debtors or the Liquidating Trustee, as appropriate, shall fund the Professional Fees Account. Fee Claims shall be paid in Cash from funds held in the Professional Fees Account when such Claims are Allowed by a Final Order of the Bankruptcy Court.  Neither the Debtors' nor the Liquidating Trust's obligations to pay Fee Claims shall be limited nor be deemed limited to funds held in the

Professional Fees Account.

b)     **Estimation of Fee Claims**.   No later than five (5) days before the anticipated Effective Date, Professionals shall provide a good faith estimate of their Fee Claims projected to be outstanding as of the Effective Date and shall deliver such estimate to the Debtors. Such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated shall be utilized by the Debtors to determine the amount to be funded to the Professional Fees Account.   The Debtors or the Liquidating Trustee shall use Cash on hand to increase the amount of the Professional Fees Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fees Account based on such estimates.

c)     **Payment of Fee Claims.**  All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, and (ii) shall be paid in full from the Professional Fees Account in such amounts as are Allowed by the Bankruptcy Court (A) in accordance with an order entered by the Bankruptcy Court approving the interim compensation of Professionals, (B) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (C) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Liquidating Trustee, as applicable.  Objections to such Fee Claims, if any, must be filed and served no later than twenty-one (21) calendar days after the filing of such fee application or such other date as established by the Bankruptcy Court**.**

The Liquidating Trustee is authorized to pay compensation for services rendered or reimbursement of expenses incurred by any Professional after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval in accordance with the Liquidating Trust Agreement.  For the avoidance of doubt, such compensation and reimbursement shall include compensation and reimbursement to the Debtors' Professionals for services rendered and expenses incurred after the Effective Date.  When all Allowed Fee Claims have been paid in full, any remaining amount in the Professional Fees Account shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Liquidating Trust without any further action or order of the Bankruptcy Court.

d)     **Professional Fee Account Not Property of the Liquidating Trust.**  Until payment in full of all Allowed Fee Claims, funds held in the Professional Fees Account shall not be considered Liquidating Trust Assets or otherwise property of the Liquidating Trust, the Debtors, or their Estates.  The Professional Fees Account shall be treated as a trust account for the benefit of holders of Fee Claims and for no other parties until all Allowed Fee Claims have been paid in full in Cash.  No other Liens, claims, or interests shall encumber the Professional Fees Account or Cash held in the Professional Fees Account in any wa**y.**

### 3. Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Liquidating Trustee, as applicable, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of (a) forty five (45) calendar days after the Effective Date (or as soon as reasonably practicable thereafter), (b) the first Business Day after the date that is thirty (30) days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or as soon thereafter as is reasonably practicable, or (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date.

### 4. U.S. Trustee Fees

All U.S. Trustee Fees due and payable prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date or as soon as is reasonably practicable thereafter. On and after the Effective Date, the Debtors or the Liquidating Trustee shall pay any and all U.S. Trustee Fees in full in Cash when due and payable. Notwithstanding the limited substantive consolidation described in Section 3 of the Plan, each Debtor or the Liquidating Trustee shall remain obligated to pay U.S. Trustee Fees until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. All U.S. Trustee Fees are Allowed. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan with respect to the payment of the U.S. Trustee Fees.

### 5. Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with the Plan, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three Business Days before the anticipated Effective Date; provided, however, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. At least three Business Days prior to the Effective Date, summary invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses related to the implementation, consummation, and defense of the Plan, whether incurred before, on or after the Effective Date.

**C.      Classification of Claims and Interests**

**1.    Classification in General**

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

**2.    Formation of Debtor Groups for Convenience Only**

The Plan (including, but not limited to, Section 2 and Section 3 of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and Distributions to be made in respect of Claims against and Interests in the Debtors under the Plan.  Except as provided in Section 6 of the Plan, such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.

**3.    Summary of Classification**

The table below designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (iii) deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Section 3 of the Plan.  All the potential Classes for the Debtors are set forth herein.

Only holders of Claims in Classes 2 and 3 are Impaired and entitled to vote on the Plan. The Estates will not be substantively consolidated; provided, however, that for purposes of voting and distribution under the Plan, the Estates shall be deemed merged and consolidated, and treated as a single Estate.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| 2 | Prepetition Term Loan Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4 | Subordinated Claims | Impaired | No (Deemed to reject) |
| 5 | Interests | Impaired | No (Deemed to reject) |
| 6A | Intercompany Claims | Impaired | No (Deemed to reject) |
| 6B | Intercompany Interests | Impaired | No (Deemed to reject) |

### 4. Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Liquidating Trustee, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## D.     Treatment of Claims and Interests

### 1. Other Priority Claims (Class 1)

a)     Classification: Class 1 consists of Allowed Other Priority Claims against the Debtors.

b)     Treatment: Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of (i) forty-five (45) calendar days after the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the first Business Day after thirty (30) days from the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter.

c)     Voting: Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

### 2. Prepetition Term Loan Secured Claims (Class 2)

a)     Classification: Class 2 consists of the Prepetition Term Loan Secured Claims.

b)     Allowance: The Prepetition Term Loan Claims (including the Prepetition Term Loan Secured Claim and the Prepetition Term Loan Unsecured Claim) shall be Allowed in the amount of $[51.1 million],[4] plus all fees and expenses owing under the Prepetition Term Loan Facility.

c)     Treatment: Except to the extent that a holder of an Allowed Prepetition Term Loan Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive (i) 100% of all Cash of the Debtors as of the Effective Date, other than Cash required on the Effective Date to fund the Trust Administrative Reserve, the Professional Fees Account, U.S. Trustee Fees, and Restructuring Expenses, (ii) 100% of Class A Liquidating Trust Interests, which shall entitle the holders of Allowed Prepetition Term Loan Secured Claims to all distributable proceeds of the Liquidating Trust other than the proceeds of Avoidance Actions (including, for the avoidance of doubt, any proceeds of any Asset Sales, any

---

4   [NTD: to include interest through Petition Date.]

residual cash in the Trust Administrative Reserve after administration of the Liquidating Trust and residual cash in the Professional Fees Account after satisfaction of Allowed Professional Fees), and (iii) payment in full of all Restructuring Expenses incurred by or on behalf of the Prepetition Term Loan Secured Parties. The foregoing treatment, together with the receipt of distributions on account of the Prepetition Term Loan Unsecured Claim, shall be in final satisfaction of the Prepetition Term Loan Claims.

d)  Voting: Class 2 is Impaired, and the holders of Prepetition Term Loan Secured Claims are entitled to vote to accept or reject the Plan.

### 3. General Unsecured Claims (Class 3)

a)  Classification: Class 3 consists of General Unsecured Claims against the Debtors.

b)  Treatment: Each holder of an Allowed General Unsecured Claim shall receive in full satisfaction, settlement, and release of, and in exchange for such Allowed General Unsecured Claim, 100% of Class B Liquidating Trust Interests.

c)  Voting: Class 3 is Impaired, and the holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4. Subordinated Claims (Class 4)

a)  Classification: Class 4 consists of Subordinated Claims against the Debtors.

b)  Treatment: Subordinated claims will be extinguished, cancelled, and released on the Effective Date. Holders of Subordinated Claims shall not receive or retain any distribution under the Plan on account of such Subordinated Claims.

c)  Voting: Class 4 is Impaired, and the holders of Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the holders of Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Claims.

### 5. Interests (Class 5)

a)  Classification: Class 5 consists of Interests in the Debtors.

b)  Treatment: Interests shall be extinguished, cancelled and released on the Effective Date. Holders of Interests shall not receive or retain any distribution under the Plan on account of such Interests.

c)  Voting: Class 5 is Impaired, and the holders of Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the holders of Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Interests.

6. **Intercompany Claims and Intercompany Interests (Class 6A and Class 6B)**

a)    Classification: Classes 6A and 6B consist of Intercompany Claims against and Intercompany Interests in the Debtors.

b)    Treatment: On or after the Effective Date, all Allowed Intercompany Claims and Intercompany Interests shall be adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or the Liquidating Trustee (as applicable).

c)    Voting: Classes 6A and 6B are Impaired, and the holders of Intercompany Claims and Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the holders of Intercompany Claims and Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Claims or Interests.

E.    **Means for Implementation**

1. **Joint Chapter 11 Plan**

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor, except to the extent the Debtors elect to sever one or more Debtors from the Plan.

2. **Plan Funding**

Distributions under the Plan shall be funded from Cash on hand, including the proceeds of the Asset Sales, as well as from Cash realized from other Liquidating Trust Assets.

### 3. Liquidating Trust

a)      **Execution of the Liquidating Trust Agreement**.   On or substantially contemporaneously with the Effective Date, the Liquidating Trust On or before the Effective Date, the Liquidating Trust Agreement shall be executed, and all other necessary steps shall be taken to establish the Liquidating Trust to hold the Liquidating Trust Assets, which shall be for the benefit of the Liquidating Trust Beneficiaries. Section 6.3 of the Plan sets forth certain of the rights, duties, and obligations of the Liquidating Trustee. In the event of any conflict between the terms of Section 6.3 of the Plan and the terms of the Liquidating Trust Agreement, unless otherwise specified in the Plan, the terms of the Liquidating Trust Agreement shall govern.

b)      **Purpose of the Liquidating Trust**.  The Liquidating Trust shall be established in accordance with the Liquidating Trust Agreement to administer post-Effective Date responsibilities of the Debtors and Wind-Down Estates under the Plan, including, but not limited to, (i) being vested with, and liquidating, the Liquidating Trust Assets, (ii) making Distributions to holders of Allowed Claims in accordance with the terms of the Plan and the Liquidating Trust Agreement, (iii) resolving all Disputed Claims and effectuating the Claims reconciliation process pursuant to the procedures prescribed in the Plan, (iv) prosecuting, settling, and resolving Causes of Action that are Liquidating Trust Assets, (v) recovering, through enforcement, resolution, settlement, collection, or otherwise, assets on behalf of the Liquidating Trust (which assets shall become part of the Liquidating Trust Assets), (vi) winding down the affairs of the Debtors and their subsidiaries, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt or take other similar action with respect to each Debtor and their subsidiaries, including by terminating the corporate or organizational existence of each such Debtor and subsidiary, and (vii) performing all actions and executing all agreements, instruments and other documents necessary to effectuate the purpose of the Liquidating Trust.

Notwithstanding anything to the contrary in Section 6.3 of the Plan, the Liquidating Trust's primary purpose is liquidating the Liquidating Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Liquidating Trust's liquidating purpose and reasonably necessary to conserve and protect the Liquidating Trust Assets and provide for the orderly liquidation thereof.

c)      **Liquidating Trust Asset**s.  The Liquidating Trust shall consist of the Liquidating Trust Assets. Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors shall be deemed to have transferred all of the Liquidating Trust Assets held by the Debtors to the Liquidating Trust, and all Liquidating Trust Assets shall vest in the Liquidating Trust on the Effective Date, to be administered by the Liquidating Trustee, in accordance with the Plan and the Liquidating Trust Agreement, free and clear of all Liens, Claims, encumbrances and other Interests. The Debtors may take all actions as may be necessary or appropriate to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan.

d)      **Liquidating Trustee.**  The Liquidating Trustee may be replaced in accordance with the Liquidating Trust Agreement. The Liquidating Trustee shall have no duties until the occurrence of the Effective Date, and on and after the Effective Date shall be a fiduciary of each of the Wind-Down Estates. The powers, rights and responsibilities of the Liquidating Trustee shall be as specified in the Liquidating Trust Agreement and Plan and shall include the authority and responsibility to fulfill the items identified in Section 6.3 of the Plan. Other rights and duties of the Liquidating Trustee and the Liquidating Trust Beneficiaries shall be as set forth in the Liquidating Trust Agreement.

e)      **Functions of the Liquidating Trustee**.  On and after the Effective Date, and subject to the Trust Administration Reserve, the Liquidating Trustee shall carry out the functions set forth in Section 6.3 of the Plan and may take such actions without further approval by the Bankruptcy Court, in accordance with the Liquidating Trust Agreement. Such functions may include any and all powers and authority to:

　　　　i.      take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims and to perform the duties assigned to the Liquidating Trustee under the Plan or the Liquidating Trust Agreement;

　　　　ii.      comply with and effectuate the Plan and the obligations hereunder;

　　　　iii.      employ, retain or replace professionals to represent him or her with respect to his or her responsibilities;

　　　　iv.      wind up the affairs of the Debtors and their subsidiaries, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt, or take other similar action with respect to each Debtor and subsidiary, including by terminating the corporate or organizational existence of each such Debtor or subsidiary;

　　　　v.      take any actions necessary to (A) resolve all matters related to the Liquidating Trust Assets and (B) vest such assets in the Liquidating Trust;

　　　　vi.      make Distributions of the Cash in the Liquidating Trust and any proceeds thereof, in excess of any amounts necessary to pay Liquidating Trust Expenses, in accordance with the terms of the Plan;

　　　　vii.      prepare and file appropriate tax returns and other reports on behalf of the Debtors and pay taxes or other obligations owed by the Debtors (including, without

limitation, any Allowed Administrative Expense Claims and Allowed Priority Tax Claims asserted by taxing authorities);

        viii.      file, prosecute, settle or dispose of any and all objections to asserted Claims;

        ix.      in consultation with and with the consent of the Prepetition Term Loan Administrative Agent, file, prosecute, settle or dispose of any and all Causes of Action other than Avoidance Actions;

        x.      file, prosecute, settle or dispose of any and all Avoidance Actions;

        xi.      establish and maintain the Disputed Claims Reserve;

        xii.      enter into and consummate any transactions for the purpose of dissolving the Debtors and their subsidiaries;

        xiii.      take such actions as are necessary or appropriate to close any of the Debtors' Chapter 11 Cases;

        xiv.      maintain the books and records and accounts of the Debtors; and

        xv.      take any other actions not inconsistent with the provisions hereof that the Liquidation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

        f)      **Fees and Expenses of the Liquidating Trust.**  From and after the Effective Date, Liquidating Trust Expenses shall be paid from the Liquidating Trust Assets in the ordinary course of business, in accordance with the Plan and the Liquidating Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Liquidating Trustee, on behalf of the Liquidating Trust, may employ professionals and pay in the ordinary course of business the reasonable fees of any employed professional for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Liquidating Trustee, are necessary to assist the Liquidating Trustee in the performance of the Liquidating Trustee's duties under the Plan and the Liquidating Trust Agreement, subject to any limitations and procedures established by the Liquidating Trust Agreement.

g) **Creation and Maintenance of Trust Accounts.** On or prior to the Effective Date, appropriate trust accounts may be established and maintained in one or more federally insured domestic banks in the name of the Liquidating Trust. Cash Deposited in the trust accounts will be invested, held and used solely as provided in the Liquidating Trust Agreement. The Liquidating Trustee is authorized to establish additional trust accounts after the Effective Date, consistent with the terms of the Liquidating Trust Agreement, as applicable. After the funding of the trust accounts on the Effective Date, the trust accounts will be funded, as applicable, by Cash proceeds obtained through litigation, settlement, disposition or other monetization of the Liquidating Trust Assets. Upon obtaining an order of the Bankruptcy Court authorizing a final Distribution or closure of all of the Debtors' Chapter 11 Cases, any funds remaining in the trust accounts shall be distributed in accordance with the Plan and the Liquidating Trust Agreement, and the trust accounts may be closed.

h) **Indemnification of Liquidating Trustee.** The Liquidating Trustee and its agents and professionals shall not be liable for actions taken or omitted in their respective capacities as, or on behalf of, the Liquidating Trustee or the Liquidating Trust, except those acts arising out of its or their gross negligence, actual fraud or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. The Liquidating Trustee (and its agents and professionals) shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the Liquidating Trustee or the Liquidating Trust, except for any actions or inactions involving gross negligence, actual fraud or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. Any indemnification claim of the Liquidating Trustee and the other parties entitled to indemnification under this subsection shall be satisfied from the Liquidating Trust Assets, as provided in the Liquidating Trust Agreement. The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its professionals.

i) **Insurance.** The Liquidating Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Liquidating Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Liquidating Trustee, which insurance coverage may, at the sole option of the Liquidating Trustee, be extended for a reasonable period after the termination of the Liquidating Trust Agreement.

j) **Records.** The Liquidating Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors necessary for the disposition of Liquidating Trust Assets and resolving Disputed Claims.

### 4. Elimination of Duplicate Claims

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Liquidating Trustee, as applicable, (i) upon stipulation between the parties in interest without a Claim objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court, or (ii) a notice of satisfaction filed on the docket and served on the applicable claimant or interest holder, provided, that such modification shall become effective only after ten days' notice to parties in interest and an opportunity to object.

### 5. Corporate Action

Upon the Effective Date, all actions contemplated by the Plan (including any action to be undertaken by the Liquidating Trustee or the Debtors) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, the Liquidating Trustee or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

### 6. Directors, Officers, Managers, Members and Authorized Persons of the Debtors

On the Effective Date, each of the Debtors' managers, members, directors, officers, and other authorized persons shall be discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and, unless subject to a separate agreement with the Liquidating Trustee, shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.   The Liquidating Trustee shall thereafter have sole and exclusive corporate authority over the Debtors and the Wind-Down Estate.

### 7. D&O Policy

As of the Effective Date, the D&O Policies and coverage for defense and indemnity under any of the D&O Policies shall remain in full force and effect subject to the terms and conditions of the D&O Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' transfer of each D&O Policy to the Liquidating Trust. Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an order of the Bankruptcy Court, confirmation of the Plan shall not impair or otherwise modify any obligations of the D&O Policies. For the avoidance of doubt, the D&O Policies provide coverage for those insureds currently covered by such policies for the remaining term of such policies and runoff or tail coverage after the Effective Date to the fullest extent permitted by such policies. On and after the Effective Date, the Debtors, the Wind-Down Estates, or the Liquidating Trustee shall not terminate or otherwise reduce the coverage under any of the D&O Policies in effect or purchased as of the Petition Date, and all managers, directors, and officers of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such managers, directors, and/or officers remain in such positions after the Effective Date. For the avoidance of doubt, nothing herein shall be construed as the Debtors assuming any obligation with respect to any self-insured retention for which the applicable insurer has the ability to assert a prepetition Claim against the applicable Debtor in accordance with the order setting the Bar Date or other order of the Bankruptcy Court.

### 8. Indemnification of Managers, Directors, Officers, and Employees

For purposes of the Plan, the obligation of the Debtors to indemnify and reimburse any Person or entity serving at any time on or after the Petition Date as one of their managers, directors, officers or employees by reason of such Person's or entity's service in such capacity, or as a

33

manager, director, officer or employee of any of the Debtors, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor(s), in accordance with any applicable law, or any combination of the foregoing, shall survive confirmation of the Plan and the Effective Date.

### 9. Withholding and Reporting Requirements

a) **Withholding Rights.**  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, provincial or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall be liable for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

b) **Forms.**  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Liquidating Trustee or such other Person designated by the Liquidating Trustee (which entity shall subsequently deliver to the Liquidating Trustee any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 or any other form or document as reasonably requested by the Liquidating Trustee or such other Person designated by it to eliminate or reduce any tax (including withholding tax), unless the Liquidating Trustee or such other Person designated by it determines it is not required to eliminate or reduce any tax (including withholding tax).  If such request is made by the Liquidating Trustee or such other Person designated by the Liquidating Trustee and the holder fails to comply before the date that is 150 days after the request is made, the amount of such distribution shall irrevocably revert to the Liquidating Trust, and any Claim in respect of such Distribution shall be forever barred from assertion against any Debtor and its respective property.

### 10. Exemption From Certain Transfer Taxes

To the maximum extent provided by section 1146 of the Bankruptcy Code, under the Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; or (ii) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be taxed under any law imposing a stamp tax or similar tax.  To the extent that the Debtors or Liquidating Trustee elects to sell any property after the Confirmation Date, such sales of property will be exempt from any transfer taxes in accordance with section 1146(a) of the Bankruptcy Code.  All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases shall be deemed to be or have been done in furtherance of the Plan.

**11. Effectuating Documents; Further Transactions**

On and after the Effective Date, the Liquidating Trustee and the Debtors are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**12. Preservation of Rights of Action**

Other than Causes of Action against an Entity that are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order entered prior to the Effective Date, the Debtors reserve and preserve any and all Causes of Action, and on the Effective Date, such causes of Action shall vest in the Liquidating Trust, free and clear of all Claims, Liens, encumbrances and other interests, and shall become Liquidating Trust Assets. On and after the Effective Date, the Liquidating Trustee shall have sole and exclusive discretion to pursue and dispose of any such Causes of Action that are or become Liquidating Trust Assets. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, and on and after the Effective Date, the Liquidating Trustee, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Prior to the Effective Date, the Debtors (and on and after the Effective Date, the Liquidating Trustee) shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**13. Closing of the Chapter 11 Cases**

On or after the Effective Date, the Liquidating Trustee or the Debtors, shall be authorized to file a motion requesting entry of one or more orders of this Court closing any of the Chapter 11 Cases. Such motion may be heard by the Court on fourteen days' notice to the U.S. Trustee and all other parties entitled to notice under Local Rule 2002-1(b). Each Wind-Down Estate shall be entitled to appoint the Liquidating Trustee to prosecute claims and defenses and through the Disbursing Agent, make distributions, and attend to other wind down affairs on behalf of each of the other prior Debtors as if such Wind-Down Estates continued to exist solely for that purpose. The Liquidating Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court, and file a motion under Local Rule 3022-1(a) to close the Chapter 11 Case of any Debtor whose case remains open at that time. Upon the filing of such a motion, the Liquidating Trustee shall file a final report with respect to all the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

### 14. Dissolution of the Committee

On the Effective Date, the Committee shall dissolve, and the members thereof and the professionals retained by the Committee thereof shall be released and discharged from all rights and duties arising from, or related to, these chapter 11 cases; provided, however, that following the Effective Date, the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) applications, and any relief related thereto, for compensation and requests for allowance of fees and/or expenses under section 503(b) of the Bankruptcy Code, (b) to enforce the releases and exculpations under Section 11 of the Plan of the Committee, the Committee's members (solely in their capacity as such), and the Committee's Related Parties, and (c) any appeals of the Confirmation Order, the Sale Order, or any other appeal to which the Committee is or was a party in interest.

### F.    Distributions

### 1.   Distribution Record Date

The Debtors and the Liquidating Trustee shall have no obligation to recognize any transfer of the Claims or Interests (i) occurring on or after the Effective Date, or (ii) that does not comply with the Bankruptcy Code or Bankruptcy Rules, including Bankruptcy Rule 3001(e).

### 2.   Date of Distributions

Except as otherwise provided herein, the Debtors or the Liquidating Trustee, as applicable, shall direct the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date.  After the Initial Distribution Date, the Liquidating Trustee shall, from time to time, determine the subsequent Distribution Dates.

### 3.   Delivery of Distributions

The Disbursing Agent shall make all distributions, allocations, and/or issuances required under the Plan.  In the event that any Distribution to any holder is not deposited or returned as undeliverable, no Distribution to such holder shall be made unless and until the Debtors or the Liquidating Trustee, as applicable, has determined the then current address of such holder, at which time such Distribution shall be made to such holder without interest; provided, however, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date such Distribution was made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidating Trust automatically and without need for a further order by the Bankruptcy Court for Distribution in accordance with the Plan and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred.

### 4.   Manner of Payment Under Plan

At the option of the Debtors, the Liquidating Trustee or the Disbursing Agent, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer from the Disbursing Agent.  Any wire transfer fees incurred in connection with the transmission of a

wire transfer will be deducted from the amount of the Distribution a holder of an Allowed Claim would otherwise receive.  The Debtors, the Liquidating Trustee, or the Disbursing Agent, as applicable, will, to the extent practicable, make aggregate Distributions on account of all the Allowed Claims held by a particular holder.

### 5. Minimum Cash Distributions

No intermediate Distribution shall be required to be made to any holder of an Allowed Claim on any Distribution Date of Cash less than [$1,000]; provided, however, that if any Distribution is not made pursuant to Section 7.5 of the Plan, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.  The Debtors, the Liquidating Trustee and the Disbursing Agent shall not be required to make any final Distributions of Cash less than [$100] to any holder of an Allowed Claim.

### 6. Setoffs

The Debtors or the Liquidating Trustee may, but shall not be required to, set off against any Claim, any Claims of any nature whatsoever that the Debtors or the Liquidating Trustee have against the holder of such Claim; provided that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidating Trustee of any such Claim the Debtors or the Liquidating Trustee may have against the holder of such Claim.

### 7. Allocation of Distributions Between Principal and Interest

Except as otherwise provided in the Plan, to the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### 8. No Postpetition Interest on Claims

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, or required by the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date.

### 9. No Distribution in Excess of Amount of Allowed Claim

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

### G.    Procedures for Disputed Claims

#### 1.    Objections to Claims

As of the Effective Date, objections to, and requests for estimation of Claims against the Debtors may be interposed and prosecuted by the Liquidating Trustee.  Such objections and requests for estimation shall be served and filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time by order of the Bankruptcy Court entered before or after the then-current Claims Objection Deadline.

#### 2.    Allowance of Claims

After the Effective Date, the Liquidating Trust shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim against a Debtor, except with respect to any Claim expressly Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is expressly Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

#### 3.    Estimation of Claims

The Debtors or the Liquidating Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limit of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim.  All the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

#### 4.    No Distributions Pending Allowance

No payment or Distribution provided under the Plan shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim; provided that payment or Distribution may be made on an Allowed portion of a Claim pending adjudication of the Disputed portion of such Claim in the discretion of the Liquidating Trustee.

#### 5.    Resolution of Claims

Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy

Code, on and after the Effective Date, the Liquidating Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Liquidating Trust may hold against any Person, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; provided that (a) any settlement of a Disputed Claim that results in an Allowed Claim in excess of $[●] must be made after notice and an opportunity for parties in interest to object and (b) any settlement of a Disputed Claim other than a General Unsecured Claim shall be with the consent of the Prepetition Term Loan Administrative Agent.

### 6. Amendments to Claims and Late Filed Claims

Following the Effective Date, except as otherwise provided in the Plan (including with respect to the filing of Claims by Governmental Units by the Governmental Bar Date), the Confirmation Order, or the Liquidating Trust Agreement, no Claim may be filed, amended, or supplemented without the approval of the Bankruptcy Court or without the prior written authorization of the Liquidating Trustee, and any such new or amended Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further action, order or approval of the Bankruptcy Court.

## H. Executory Contracts and Unexpired Leases

### 1. Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned (including any Executory Contract or Unexpired Lease assumed and assigned in connection with a Sale Transaction) shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (ii) is a contract, lease, or other agreement or document entered into in connection with the Plan; (iii) is a D&O Policy or an insurance policy; or (iv) is identified for assumption on the Assumption Schedule included in the Plan Supplement. Executory Contracts and Unexpired Leases identified for assumption on the Assumption Schedule shall be deemed assumed pursuant to section 365 of the Bankruptcy Code as of the Effective Date.

### 2. Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan must be filed with Bankruptcy Court and served on the Liquidating Trustee no later than thirty (30) days after the notice of occurrence of the Effective Date.  The notice of occurrence of the Effective Date shall include the date by which Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases must be filed.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be forever barred from assertion, and shall

not be enforceable against the Debtors, the Liquidating Trust, the Debtors' Estates, or the property for any of the foregoing, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

### 3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in full in Cash on the Effective Date (or as soon as reasonably practicable thereafter), subject to the limitation described below, by the Debtors or the Liquidating Trust, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (i) the amount of the Cure Obligation, (ii) the ability of the Liquidating Trust or any other applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease, or (iii) any other matter pertaining to assumption or assumption and assignment (as applicable), the obligations of section 365 of the Bankruptcy Code shall be deemed satisfied following the entry of one or more Final Orders, which may include the Confirmation Order, resolving the dispute and approving the assumption or assumption and assignment (as applicable); provided, that the Debtors or the Liquidating Trust (as applicable) may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### 4. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**5.   Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Assumption Schedule or the Sale Order, or anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder.   In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Liquidating Trustee, as applicable, shall have sixty 60 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

**I.    Conditions Precedent to the Effective Date**

**1.   Conditions Precedent to the Effective Date**

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

a.      the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall have become a Final Order;

b.      the DIP Orders shall be in full force and effect, and there shall be no event of default under the DIP Orders, which has not been waived by the Prepetition Term Loan Administrative Agent;

c.      all funding, actions, documents and agreements necessary to implement and consummate the Plan and the transactions and other matters contemplated thereby, shall have been effected or executed, including the funding of the Trust Administration Reserve;

d.      the Sale Transaction shall have been consummated in accordance with the relevant asset purchase agreement and Sale Order, and the proceeds of the Artivo Sale shall have been distributed in accordance with the DIP Orders;

e.      the Liquidating Trust shall be established and validly existing and the Liquidating Trust Agreement shall have been executed;

f.      all actual and estimated Restructuring Expenses shall have been paid in full accordance with Section 2.6 of the Plan;

g.      the Debtors shall have funded the Professional Fees Account in accordance with Section 2.3 herein;

h.      the Trust Administration Reserve shall have been funded;

i.      no Governmental Unit or federal or state court of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any law or order (whether temporary, preliminary or permanent), in any case which is in effect and which prevents or prohibits consummation of the Plan or any of the other transactions contemplated hereby and no Governmental Unit shall have instituted any action or proceeding (which remains pending at what would otherwise be the Effective Date) seeking to enjoin, restrain or otherwise prohibit consummation of the transactions contemplated by the Plan;

j.      all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan as of the Effective Date shall have been received, waived or otherwise resolved; and

k.      all documents and agreements necessary to implement the Plan, including those set forth in the Plan Supplement, shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

## 2.   Waiver of Conditions Precedent

Each of the conditions precedent in Section 10.1 other than the condition set forth in Section 10.1(a) may be waived in writing by the Debtors and the Prepetition Term Loan Administrative Agent. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

## 3.   Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## 4.   Notice of Effective Date

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## 5.   Effect of Vacatur of Confirmation Order

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release

of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

## J.    Settlement, Releases, Injunctions, and Related Provisions

### 1.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Debtors and vest in the Liquidating Trust.

### 2.    Binding Effect

Confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code because the Plan is a liquidating chapter 11 plan. Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors, and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

### 3.    Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 4.    Releases by the Debtors

**As of the Effective Date, except (i) for the rights that remain in effect from and after the Effective Date to enforce the Plan or the Sale Transaction; and (ii) as otherwise provided in the Plan or in the Confirmation Order, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, by the Releasing Parties, including Debtors and the Estates (including the Wind-Down Estates), in each case, on behalf of themselves and their respective successors (including the Liquidating Trust), assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons and Entities, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, in whole or in part, the**

43

Debtors, the Chapter 11 Cases, the Sale Transaction, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration or implementation of the Plan, including the issuance or distribution of the Liquidating Trust Assets pursuant to the Plan, the creation of the Liquidating Trust, the business or contractual arrangements between any Debtor and any Released Party, the Disclosure Statement, the Plan (including the Plan Supplement), or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Notwithstanding anything to the contrary to the foregoing, the release set forth above does not release any post-Effective Date obligations of any Person under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Sale Transaction.

5. **Exculpation**

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each of the Exculpated Parties are hereby exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, Causes of Action, remedy, loss, and liability for any Claim arising on or after the Petition Date through the Effective Date in connection with, related to, or arising out of the filing or administration of the Chapter 11 Cases, the negotiation and approval of the Asset Sales, the postpetition purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors; the negotiation and pursuit of the Disclosure Statement, the Sale Transaction, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the property to be distributed under the Plan (including Liquidating Trust Assets); the creation and administration of the Liquidating Trust; or the transactions in furtherance of any of the foregoing; except for actual fraud, criminal acts or willful misconduct, as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth herein does not release any post-Effective Date obligation or liability of any Entity or Person under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

6. **Injunction**

a) From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished or released pursuant to the Plan, from taking any of the following actions against the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust, or the property of

any of the Debtors, the Released Parties, the Liquidating Trustee or the Liquidating Trust (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum); (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind; (iv) asserting setoff unless such setoff was formally asserted in a timely Filed proof of Claim or in a pleading Filed with the Bankruptcy Court prior to entry of the Confirmation Order (notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff) or right of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

       b)     Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, and other parties in interest, along with their Related Persons, shall be enjoined from taking any actions to interfere with the implementation or substantial Consummation of the Plan by the Debtors, the Liquidating Trustee and/or their respective Related Persons, as applicable.

       c)     The benefit of the injunctions in Section 11.7 of the Plan shall extend to any successors of the Debtors, the Liquidating Trustee, the Liquidating Trust, the Released Parties, and their respective property and interests in property.

## K.    Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

1.  to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

2.  to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motions, adversary proceeding, application, contested matter or other litigated matter brought by the Liquidating Trustee;

3.  to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

4.  to consider Claims or the allowance, classification, priority, compromise, estimation or payment of or objection to any Claim;

5.  to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

6. to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

7. to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

8. to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

9. to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the Sale Order, the Liquidating Trust Agreement, or any agreement, instrument, or other document governing or relating to any of the foregoing;

10. to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation;

11. to hear any disputes arising out of, and to enforce, any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar Claims pursuant to section 105(a) of the Bankruptcy Code;

12. to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

13. to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

14. to adjudicate any and all disputes arising from or relating to distributions under the Plan;

15. to hear, determine and resolve any cases, matters, controversies, suits, disputes or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including with respect to the releases, exculpation and injunction provisions contained in Section 11 of the Plan and the Confirmation Order;

16. to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

17. to enter one or more final decrees closing the Chapter 11 Cases;

18. to interpret and enforce the Confirmation Order and all other orders previously entered by the Bankruptcy Court in these Chapter 11 Cases;

46

19. to recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

20. to hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

21. any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, the Sale Order or any contract, instrument, release, indenture, or other agreement or document created in connection therewith.

## L.    Miscellaneous Provisions

### 1.    No Revesting of Assets

To the extent not otherwise distributed in accordance with the Plan, the property of the Debtors' Estates shall not revest in the Debtors on or after the Effective Date but shall instead vest in the Liquidating Trust, to be administered by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.

### 2.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 509 and 510 of the Bankruptcy Code, or otherwise.  Pursuant to sections 509 and 510 of the Bankruptcy Code, the Debtors reserve the right for the Liquidating Trustee to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 3.    Payment of Statutory Fees

All U.S. Trustee Fees due and payable prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date or as soon as is reasonably practicable thereafter.  On and after the Effective Date, the Debtors or the Liquidating Trustee shall pay any and all U.S. Trustee Fees in full in Cash when due and payable.  Notwithstanding the limited substantive consolidation described in Section 3 of the Plan, each Debtor or the Liquidating Trustee shall remain obligated to pay U.S. Trustee Fees until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  All U.S. Trustee Fees are Allowed.  The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan with respect to the payment of the U.S. Trustee Fees.  The provisions of Section 13.3 of the Plan control and govern any provisions of the Plan to the contrary.

The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Liquidating Trustee

and each of Wind-Down Estates shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due

### 4. Amendments

      a) **Plan Modifications.** Prior to the Effective Date, the Plan may be amended, modified or supplemented by the Debtors, with the consent of the Prepetition Term Loan Administrative Agent, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law or as ordered by the Bankruptcy Court, without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date but before substantial consummation of the Plan, the Debtors may, with the consent of the Prepetition Term Loan Administrative Agent, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

      b) **Other Amendments.** Before the Effective Date, to the extent provided in section 1127 of the Bankruptcy Code, the Debtors, may make appropriate technical adjustments and modifications to the Plan and any of the documents prepared in connection herewith without further order or approval of the Bankruptcy Court but with the consent of the Prepetition Term Loan Administrative Agent (not to be unreasonably withheld).

### 5. Revocation or Withdrawal of the Plan

      The Debtors reserve the right to revoke or withdraw the Plan for all Debtors prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (ii) nothing contained in the Plan shall: (A) constitute a waiver or release of any Claims or Interests; (B) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (C) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

### 6. Severability of Plan Provisions upon Confirmation

      If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing,

is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Liquidating Trustee (as the case may be) and the Prepetition Term Loan Administrative Agent; and (iii) nonseverable and mutually dependent.

### 7.  Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

### 8.  Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 9.  Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 10.  Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Releasing Parties, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Liquidating Trustee.

### 11.  Successor and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

### 12.  Entire Agreement

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

**13. Notices**

All notices, requests and demands to or upon the Debtors or the Liquidating Trustee, as applicable, to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a) <b><u>if to the Debtors</u></b>:

**Mosaic Companies, LLC**
400 Technology Ct. Ste R
Smyrna, GA 30082
Attention:     Randall Jackson

-and-

**Morris Nichols Arsht & Tunnell LLP**
1201 North Market Street
Wilmington, DE 19899-1347
Attention:     Derek C. Abbott
                      Matthew B. Harvey
                      Sophie Rogers Churchill
                      Avery Jue Meng
Telephone:    302-658-9200
Facsimile:     302-658-3989

(b) if to the Liquidating Trustee, to the parties designated for notice and in the manner set forth in the Liquidating Trust Agreement.

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Liquidating Trust is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to (i) the Prepetition Term Loan Administrative Agent; (ii) those Entities who have filed such renewed requests, and (iii) those Entities whose rights are affected by such documents.

## VII.    CERTAIN RISK FACTORS AFFECTING THE DEBTORS

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

A.      **Certain Bankruptcy Law Considerations**

1.    **Risk of Non-Confirmation or Delay of the Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.

2.    **Risk of Failing to Satisfy Vote Requirement**

In the event that the Debtors are unable to get sufficient votes from the voting vlasses, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Claims as those proposed in the Plan.

3.    **Failure to Satisfy Administrative Claims or Otherwise Agree to Alternative Treatment and Other Factors that May Impact Administrative Solvency**

To confirm a chapter 11 plan, section 1129(a)(9) of the Bankruptcy Code requires, among other things, that "except to the extent that the holder of a particular claim has agreed to a different treatment of such claim," claims entitled to administrative priority under section 507(a)(2) or 507(a)(3) must be paid in full in order for a debtor to confirm a chapter 11 plan.  To the extent that a Debtor is unable to pay such claims in full or otherwise agree to treatment with the applicable holder, such Debtor may be unable to confirm a chapter 11 plan.  Furthermore, certain factors could also impact the Debtors' administrative solvency, including reconciliation of Administrative Expense Claims, which may impact the Debtors' ability to confirm a chapter 11 plan for all or certain of the Debtors.  If no plan can be confirmed, one or more of these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.

4.    **Non-Consensual Confirmation or "Cram Down"**

In the event any impaired class of claims or interests does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class).  This process is commonly referred to as "cramdown".  As to each impaired class that has not accepted the plan, the bankruptcy court must determine that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  In general, a plan does not discriminate unfairly among classes of equal priority if it provides the holders of claims in those classes with substantially similar treatment or there is a justification for any disparate treatment.  A plan is fair and equitable as to a class if either (i) the holders of claims in the class are receiving payment in full or (ii) no class of junior claims or interests is receiving or retaining value under the plan on account of their junior claims and interests.

Under the Plan, Classes 4, 5, 6A and 6B are deemed to reject the Plan  The Debtors believe that the Plan is fair and equitable and does not discriminate unfairly with respect to these Classes because, among other things, (i) no Class of claims or interests junior to such Classes is receiving

or retaining property under the Plan and (ii) no Class of equal priority is unjustifiably receiving disparate treatment of claims of equal priority. The Debtors also believe that, if Class 2 or Class 3 were to reject the Plan, then the Debtors would be able to satisfy the cramdown requirements as to such rejection class for similar reasons. There can be no guarantee, however, that the Court will find that the cramdown requirements are met with respect to a particular rejecting Class.

### 5. Conversion to Chapter 7

If the Plan cannot be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, one or more of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed or elected to liquidate the applicable Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Section IX.C.2 hereof, as well as the liquidation analysis annexed hereto as Exhibit B, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests (the "Liquidation Analysis").

## B. Additional Factors to be Considered

### 1. The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 2. No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court, or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### 3. No Legal or Tax Advice Is Provided to You by This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interests should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 4. No Admission Made

Nothing contained in the Plan or Disclosure Statement shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests, or on the rights of any other Person or Entity.

### 5. Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim of the Debtors or Cause of Action or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement or in the Plan or Plan Supplement.  The Debtors or the Liquidating Trustee, as applicable, may seek to investigate, file, and prosecute Causes of Action, Claims and objections to Claims and Interests after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Causes of Action, Claims, or objections to such Claims or Interests.

### 6. No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that holder's Claim or Interest, or for the Debtors or the Liquidating Trust to recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified in this Disclosure Statement, the Plan, or the Plan Supplement.

### 7. Risk Associated with Forward Looking Statements

The financial information contained in this Combined Disclosure Statement and Plan has not been audited.  In preparing the Disclosure Statement and Plan, the Debtors relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in the Disclosure Statement and Plan, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

### 8. Information Was Provided by Debtors and Was Relied Upon by Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

### 9. Certain Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASS UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND APPLICABLE FOREIGN TAX CONSEQUENCES OF THE PLAN.

## VIII.    VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of Allowed Claims or General Unsecured Claims should carefully review the Plan attached hereto as <u>Exhibit A</u>. All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

This Section is qualified in its entirety by the Solicitation Procedures Order.

## A.    Voting Instructions and Voting

Holders in Class 2 (Prepetition Term Loan Secured Claims) and Class 3 (General Unsecured Claims) are entitled to vote to accept or reject the Plan. All holders within such Classes have been sent a Ballot together with this Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

Each Ballot contains detailed voting instructions. Each Ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots. The Voting Record Date for determining which holders are entitled to vote on the Plan is [●]. The Voting Deadline is [●], at 4:00 p.m. (Prevailing Eastern Time).

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from holders of Claims within Class 2 and Class 3 who are entitled to a vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballot sent to you with this Disclosure Statement. In order for your Ballot to be counted, please complete and sign your Ballot, and submit it so as to be received by 4:00 p.m. (Prevailing Eastern Time), on [●] using <u>one</u> of the following methods:

<u>For holders of Claims in Class 2 (Prepetition Term Loan Secured Claims) and Class 3 (General Unsecured Claims), if by First Class Mail, Overnight Courier or Hand Delivery</u>:

Mosaic Companies, LLC Ballot Processing Center
c/o Epiq Corporate Restructuring, LLC
777 Third Avenue, 12th Floor
New York, New York 10017

If you would like to coordinate hand delivery of your Ballot, please MosaicCompanies@epiqglobal.com with a reference to "Mosaic Solicitation" in

the subject line, and at least twenty-four (24) hours in advance and provide the anticipated date and time of your delivery.

If by Electronic, Online Submission:

Visit the Debtors' restructuring website at: https://dm.epiq11.com/case/MosaicCompanies, click on the "E-Ballot" button below the "Case Actions" section on the of the landing page, and follow the directions to submit your Ballot online.

Online "E-Balloting" is the sole manner in which Ballots will be accepted via electronic or online transmission for holders of Claims within Class 2 and Class 3. Ballots submitted by holders of Claims within Class 2 and Class 3 via facsimile or email will not be counted.

ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, AND EXCEPT AS EXPRESSLY PROVIDED ABOVE, NO BALLOTS RECEIVED BY TELECOPY, FACSIMILE, EMAIL, OR OTHER ELECTRONIC MEANS WILL BE ACCEPTED. Following the Voting Deadline, the Claims Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan. Ballots submitted to the Debtors or any of its agents and advisors (other than the Voting Agent) will not be counted.

If you have any questions regarding the Ballot, did not receive a return envelope with your Ballot, did not receive an electronic copy of the Disclosure Statement and the Plan, or need physical copies of the Ballot or other enclosed materials, please contact the Debtors' solicitation and claims agent, ("Epiq") or the "Voting Agent"), in writing at Mosaic Companies, LLC Ballot Processing Center, c/o Epiq Corporate Restructuring, LLC, 777 Third Avenue, New York, NY 10017, or by email at MosaicCompanies@epiqglobal.com with a reference to "Mosaic Solicitation" in the subject line, or by calling (888) 863-4070 (U.S. and Canada) or 1 (503) 782-9294 (International) and request to speak with a member of the solicitation team.

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT (A) WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, (B) PARTIALLY ACCEPTS AND PARTIALLY REJECTS THE PLAN, OR (C) INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU ARE AN ELIGIBLE HOLDER AND YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT, OR LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE VOTING AGENT BY CALLING (888) 863-4070 (TOLL FREE IN THE U.S. AND CANADA) OR 1 (503) 782-9294 (OUTSIDE THE U.S.) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM OR BY EMAILING MOSAICCOMPANIES@EPIQGLOBAL.COM WITH A REFERENCE TO "MOSAIC SOLICITATION" IN THE SUBJECT LINE.

B.      **Parties Entitled to Vote**

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan.  Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an Impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the Plan, and, accordingly, holders of such Claims and Interests do not vote on the Plan and will not receive a Ballot.  If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or Interest to have accepted the Plan and, accordingly, holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

As set forth above, the Bankruptcy Code defines "acceptance" of a plan by a class if: (1) as to a class of claims, acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (2) as to a class of interests acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the interests that cast ballots for acceptance or rejection of the plan.

Claims in Class 2 and Class 3 are impaired under the Plan and entitled to vote to accept or reject the Plan.  Claims in all other Classes are either unimpaired and presumed to accept or will not receive a Distribution under the Plan and deemed to reject the Plan, and therefore are not entitled to vote.  For a detailed description of the treatment of Claims and Interests under the Plan, see Section V.C of this Disclosure Statement.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all holders of Claims or Interests in Classes 4 (Subordinated Claims), 5 (Interests), 6A (Intercompany Claims), and 6B (Intercompany Interests).  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Section IX.C of this Disclosure Statement.

C.      **Agreements Upon Furnishing Ballots**

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept all of the terms of, and conditions to, this solicitation, including the injunction, releases, and exculpations set forth in

Sections 11.4, 11.5, and 11.6 therein.  All parties in interest retain their right to object to confirmation of the Plan.

**D.    Change of Vote**

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

**E.    Waivers of Defects, Irregularities, Etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole reasonable discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including of the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors or the Bankruptcy Court may determine.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots to the Voting Agent will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously submitted (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

**F.    Miscellaneous**

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Voting Agent is authorized, but not required, to contact parties that submit incomplete or otherwise deficient votes to make a reasonable effort to cure such deficiencies.  If you simultaneously return duplicative Ballots that are voted inconsistently, those Ballots will not be counted.  An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of the Claims or Interests, as applicable, who actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may,

in their sole discretion, reject such Ballot as invalid, and therefore decline to include it in the tabulation of votes for or against the Plan.

### G.    Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

## IX.    CONFIRMATION OF THE PLAN

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan.  The Bankruptcy Court has scheduled the Confirmation Hearing to commence on [●] at [●] _.m. (Prevailing Eastern Time). The Confirmation Hearing may be continued from time to time without further notice other than the announcement of the adjourned date(s) at the Combined Hearing or any continued hearing or as indicated in any notice of agenda of matters scheduled for hearing filed with the Court. Adjournments of the Confirmation Hearing shall be reflected on the Court's docket and the Debtors' case website maintained by the Voting Agent.

### B.    Objections

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules for the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the parties listed below no later than the Plan Objection Deadline of [●], at 4:00 p.m. (Prevailing Eastern Time):

| Debtors | Counsel to the Debtors |
|---|---|
| Mosaic Companies, LLC | Morris, Nichols, Arsht & Tunnell LLP |
| Attn: Randall Jackson | Derek C. Abbott (No. 3376) |
| 400 Technology Ct. Ste R | Matthew B. Harvey (No. 5186) |
| Smyrna, GA 30082 | Sophie Rogers Churchill (No. 6905) |
| | Avery Jue Meng (No. 7328) |
| Office of the United States Trustee | 1201 Market Street, 16th Floor |
| | Wilmington, Delaware 19801 |
| 844 N. King Street, Room 2207 | Telephone: (302) 658-9200 |
| Wilmington, Delaware 19801 | |

Attn:  Joseph McMahon          Facsimile: (302) 658-3989
      Benjamin A. Hackman      Email: dabbott@morrisnichols.com
Telephone: (302) 573-6491         mharvey@morrisnichols.com
Facsimile: (302) 573-6497         srchurchill@morrisnichols.com
Email: Joseph.McMahon@usdoj.gov    ameng@morrisnichols.com
      Benjamin.a.hackman@usdoj.gov

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

## C.    Requirements for Confirmation of Plan

### 1.    Requirements of Section 1129(a) of the Bankruptcy Code

General Requirements:  at the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

a)    the Plan complies with the applicable provisions of the Bankruptcy Code;

b)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

c)    the Plan has been proposed in good faith and not by any means forbidden by law;

d)    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

e)    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of holders of Claims and Interests and with public policy;

f)    with respect to each Class of Claims or Interests, each holder of an Impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

g)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan

or is not impaired under the Plan;

h)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and priority claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

i)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

j)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation is proposed in the Plan; and

k)    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

## 2. Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan, all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as Exhibit B.

The Liquidation Analysis is a comparison of (i) the estimated recoveries for creditors and equity holders of the Debtors that may result from the Plan and (ii) an estimate of the recoveries that may result from a hypothetical chapter 7 liquidation. The Liquidation Analysis is based upon a number of significant assumptions which are described therein. The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical

chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 3.  Feasibility

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  Since the Plan provides for the liquidation of the Debtors, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-Confirmation obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds to liquidate the Debtors' remaining assets.  Accordingly, the Debtors believe the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code.  Moreover, <u>Section VII</u> hereof sets forth certain risk factors that could impact the feasibility of the Plan.

### 4.  No Unfair Discrimination

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe that, under the Plan, all Impaired classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other classes of Claims and Interests having the same priority.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

### 5.  Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class.  In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

a)  **Secured Creditors.**  With respect to a class of impaired secured claims, a proposed plan must provide the following: (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the

estates' interest in such property, or (b) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (c) of this paragraph, or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

b)    **Unsecured Creditors.**  With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

c)    **Holders of Equity Interests.**  With respect to a class of equity interests, a proposed plan must provide the following: (i) that each holder of an equity interest receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest or (ii) that the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the Plan on account of such junior interest any property.

## D.    Application to the Plan

As to any Class that may reject, or be deemed to reject, the Plan, the Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirements, because, as to any such dissenting Class, there is no Class of equal priority receiving more favorable treatment, and such Class will either be paid in full, or no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

## E.    Alternatives to the Plan

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative chapter 11 plan, or (ii) a liquidation under chapter 7 of the Bankruptcy Code.

a)    **Alternative Chapter 11 Plan.**  If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a Chapter 11 plan has expired, any other party in interest) could attempt to formulate a different plan.

b)    **Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law.**  If no plan can be confirmed, one or more of these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as

Exhibit B.

The Debtors believe that liquidating the Debtors' Estates under the Plan will provide Holders of Allowed Claims with a larger, more timely recovery because of the fees and expenses that would be incurred in a chapter 7 liquidation, including the potential added time and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors and their estates.  The Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtors' assets and that the assets available for distribution to creditors would be reduced by such additional expenses.  Further, a liquidation would result in the Debtors receiving less proceeds for certain assets the Debtors expect to recover from the sale process in chapter 11.

Accordingly, the Debtors believe that a chapter 7 liquidation or other bankruptcy would result in smaller distributions being made to creditors than those provided for under the Plan because of additional expenses and claims that would be generated during the liquidation, as well as lower recoveries on certain assets of the Debtors.  Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

## X.    CONCLUSION AND RECOMMENDATION OF THE DEBTORS

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urges holders of Impaired Claims in Class 2 (Prepetition Term Loan Secured Claims) and Class 3 (General Unsecured Claims) to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than the Voting Deadline, [●], at 4:00 p.m. (ET).

Dated: [●], 2025

Respectfully submitted,

By:_____
        Name:
        Title:

Exhibit A: The Plan

Exhibit B: Liquidation Analysis